Rosalyn QUERRY, Plaintiff,

v.

Francis J. MESSAR, individually, Emil Cavorti, individually, Donald Christopher, individually, Oracle Management Services, Inc. and the City of Yonkers, N.Y., Defendants.

No. 98 CIV. 0019(WCC).

United States District Court, S.D. New York.

Nov. 1, 1999.

Law Offices of Michael H. Sussman, New York City (Michael H. Sussman, Stephen Bergstein, of counsel), for Plaintiff.

Mussman & Northey, New York City (Rebecca Northey, of counsel), for Defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Rosalyn Querry brings this action against the City of Yonkers, former Yonkers Police Commissioner Donald Christopher, Captain Francis J. Messar

and Lieutenant Emil Cavorti (collectively, the "City defendants"), alleging gender discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., ("Title VII"), and the Civil Rights Act of 1871, 42 U.S.C. § 1983. In a prior opinion, this Court granted in part and denied in part the City defendants' motion for summary judgment with leave to renew their motion upon completion of discovery.[1] *Querry v. Messar,* 14 F.Supp.2d 437 (S.D.N.Y.1998). Discovery is now complete and the City defendants have renewed their motion for summary judgment pursuant to Fed.R.Civ.P. 56 with regard to plaintiff's surviving claims.

Plaintiff alleges that the City defendants treated female officers who were injured on the job differently from similarly-situated male officers and subjected injured female officers to adverse employment actions and a hostile work environment. Specifically, plaintiff claims that the City defendants: (1) ordered her to return to work despite her doctors' orders to the contrary; (2) intimidated her doctors into changing their medical opinions; (3) denied plaintiff disability and leave benefits; (4) assigned plaintiff to midnight tours for discriminatory reasons; and (5) failed to return plaintiff to her post in the Forensics Laboratory.

For the reasons that follow, the City defendants' motion for summary judgment is denied in part and granted in part.

## BACKGROUND

Plaintiff has been a police officer with the Yonkers Police Department (the "Department") since 1987. Defendant Donald Christopher was the Department's commissioner from January 1996 until his retirement in April 1998. Defendant Francis Messar is a captain in the Department and was the commanding officer of the Department's Medical Control Unit (the "MCU") from September 1996 until April 1998. Defendant Emil Cavorti is a lieutenant with the Department who has served as the supervisor of the MCU since September 1996.

The MCU is responsible for monitoring members of the Department who are sick, injured or disabled. Oracle Management Services, Inc. ("Oracle") is a third-party medical provider and claims administrator for the Department. Oracle also served as the Department's medical authority from 1992 until the position of police surgeon was reinstated in the fall of 1998. As the Department's medical authority, Oracle made medical determinations as to an officer's ability to work at all or to work limited or full-time duty after an illness or injury. During that time, although Oracle was the Department's medical authority, officers continued to see their private physicians for medical treatment, and these physicians offered medical opinions on the officers' ability to work.

Members of the Department receive unlimited leave with full pay when they are sick or injured (due to an off-duty injury) or disabled (due to an on-duty injury). Members who have used a certain number of "sick" leave days are placed in a Chronic Absence Control Program, which represents a blight on their record. (Sussman Aff. ¶ 19, Ex. 19.) Generally the salary of members who are out on "disability" leave is not taxable. Pursuant to N.Y. Gen. Mun. Law § 207–c, the City of Yonkers is required to pay for medical treatment of officers injured on the job. The City provides insurance coverage for off-duty injuries and illnesses, although, with co-payments and limits on the number of treatments, the coverage is less comprehensive than benefits provided for on-duty injuries under § 207–c.

---

1. The court also granted the motion of defendant Oracle Management Services, Inc. to dismiss the claims against it without prejudice and with leave to amend. Plaintiff did not amend her complaint.

From May 1987 until an on-the-job injury January 31, 1996, Querry was never absent by reason of disability or illness and she received several awards and commendations for service. She worked full-time in the Second Precinct, first on a special duty assignment in the Forensics Laboratory from July 1988 through January 1995, then on patrol from January 1995 through January 1996. On January 31, 1996, Querry slipped and fell on ice while on duty and injured her back. She was out of work on medical leave from February 1, 1996 to March 29, 1996. On March 19, a chiropractor examined Querry at Oracle's request. The chiropractor recommended that Querry return to work, but on light duty for the first two months. On March 30, Querry was ordered to return to work. She reported to work, but left after completing half her shift, complaining of back and leg pain. Querry states that she was unable to work due to pain on April 2 and 3. (Pl.Aff.¶ 14.) On April 5, Querry gave the Department notes from two of her treating physicians recommending she work a four-hour shift on light duty.

On April 21, Querry went off duty again due to back pain. She was examined by Oracle chiropractor Dr. Michael J. Bardwell on April 23, 1996. Dr. Bardwell reported he saw "no reason why this woman cannot continue to work in a light duty capacity full days" and found Querry could return to full duty in two weeks. (Sussman Aff. ¶ 4, Ex. 4.) However, Querry went off duty again from May 6 through 27 due to pain. (Pl.Aff.¶ 14.) Querry's general practitioner wrote that Querry was unable to work from May 28 to June 28 due to her lower back pain and a possible herniated disc. However, Querry states that she was ordered to return to work May 28, and that she worked until June 28. (Pl.Aff.¶¶ 14–15.) An Oracle physician found that Querry could return to light duty on June 19 and to full duty in another two weeks. However, a week later Querry's personal chiropractor advised that Querry could work only four-hour shifts

starting July 1. On July 2, Querry returned to work, but left before the completion of her shift, complaining of back pain. She was ordered to return to work on July 5 for four hours a day on light duty. An Oracle chiropractor, Dr. Jonathan Scott Zimbardo, examined Querry July 7, 1996 and recommended that Querry have an MRI. He recommended that if the results were negative, Querry could return to work on light duty for four weeks and full duty thereafter. The MRI showed "diffuse disc bulges" and "disc degeneration." (Sussman Aff. ¶ 6, Ex. 6.)

Querry claims that despite the MRI results, she was ordered to return to work. Medical records indicate she was examined by Dr. Bardwell at Oracle's request on September 12. Bardwell reviewed the MRI findings and found "based on the minimal amounts of objective findings ... this claimant may return to an eight hour work day as a police officer ... on a light duty status." (Messar Reply Decl. Ex. R.) Querry left work early the following day, complaining of pain. That day, her private chiropractor signed a note recommending that Querry work four-hour tours, a recommendation in which her general practitioner concurred on September 16. On September 18 and 19, Querry left work early, complaining of muscle spasms in her back. She was re-examined at Oracle's request by Dr. Bardwell on September 19, who again found that Querry could work an eight-hour day. Querry did not complete her tours on September 20, 24 and 26 due to back pain. (Sussman Aff. ¶ 15, Ex. 15.) On September 20, Querry's private chiropractor wrote that Querry was unable to work a full eight-hour day.

Querry received notice on September 25, 1996 from Commissioner Christopher that her § 207–c benefits were terminated due to her refusal to perform light duty. (Id. ¶ 16, Ex. 16.) Querry claims that as a result of losing her § 207–c benefits, the City no longer covered her medical treatments and her salary and taxes were nega-

tively impacted. She states she had to use leave time when absent from work and was placed in the Chronic Absence Control Program. Querry also claims that she began to experience anxiety, panic attacks and an irregular heartbeat following the termination of her benefits. Her general practitioner wrote a note to the Department describing these anxiety symptoms on October 18, 1996 and the Department referred Querry to a psychologist to evaluate her fitness for duty. The psychologist reported that "no evidence is found to suggest that P.O. Querry is malingering or exaggerating her symptoms including the physical pain she experiences." (Id.¶ 18, Ex. 18.) The psychologist recommended that Querry "remain on restricted duty status without her weapon."

On November 20, 1996, Querry's cardiologist reported that he was treating Querry for "hyperkinetic heart syndrome" and "chronic anxiety," that she was on several medications and that she was not physically fit for duty. On November 29, 1996, Querry's general practitioner reported that Querry was under his care for "anxiety, neurosis, cardiac tachycardia" and found that she should remain out of work, with the possibility of returning in January. (Id.¶ 20, Ex. 20.) An Oracle neurologist examined Querry on November 20 and found she could return to work on light duty immediately, and then gradually work toward full duty within the next two months. (Id.¶ 21, Ex. 21.)

Querry claims that despite her private doctors' advice to the contrary, she was ordered to return to work eight-hour tours in the Communications Department starting November 29, 1996. Querry also claims that Cavorti told plaintiff she would not be paid if she left work early, even though he was aware of the Department's unlimited sick leave policy under which officers are paid for their entire tour even if they leave early due to illness or injury. (Pl.'s Br. at 7.) Plaintiff states that she returned to work on November 29, but had a panic attack and asked to be relieved

from duty. (Id.) The highest-ranking officer present was a sergeant who contacted Messar. Messar told the sergeant to place Querry on medical leave until Oracle could schedule an evaluation. Querry claims that she was disciplined on the following day for failing to report for her scheduled tour. (Id. at 8.)

Querry went out of work on January 13, 1997 following the Department's receipt of a note from Querry's private psychiatrist Dr. Robert Werboff that she was unable to work, that she was being started on new medications for her psychiatric disability, and that he expected full recovery in four to eight weeks. Dr. Werboff completed a duty status report indicating that plaintiff was unable to perform any of the listed duties, which included, *inter alia,* "operating a motor vehicle." (Id.Ex. 28.) Plaintiff claims that after receiving this report, Cavorti told plaintiff that she would not be permitted to drive her own motor vehicle and Messar so ordered. Dr. Werboff sent Cavorti a letter clarifying that "Ms. Querry may not drive a police car during this period of temporary disability. She may, however, drive her own vehicle for non-police activities." (Id.Ex. 30.) Despite this letter, Messar and Cavorti upheld the restriction. Plaintiff claims she feared she would be arrested if she was seen driving her own car. (Pl.Decl.¶ 18.)

On April 16, 1997, Dr. Werboff informed the Department that Querry would be able to return to work on April 21, 1997 in a light duty capacity in a division other than the Communications Division. On April 19, the Department asked Dr. Werboff to send the Department information on Querry's medications. Dr. Werboff replied that "neither of [Querry's] medications would prohibit her from returning to light duty." (Sussman Aff. Ex. 37.) In an April 23, 1997 memorandum to Christopher, Messar stated that the Department was having trouble finding a light duty post for Querry outside the Communications Division.

An Oracle psychiatrist evaluated Querry on May 20, 1997. The psychiatrist opined

that Querry had "resolving" anxiety disorder with panic attacks arising from Querry's "concerns that she was going to lose her disability status and her benefits." (Id.Ex. 39.) The doctor found that Querry could return to work full-time. On July 5, 1997, Querry was ordered to work midnight tours despite the fact she had consistently worked the day shift since 1988. (Pl.Decl.¶ 20.)

The City defendants claim that the day after Querry started working midnight tours, Querry tripped on a step and was out of work claiming injury the next four days. (Messar Decl. ¶ 18, Ex. N.) She worked four more days in July, then took off the month of August for vacation. Querry was scheduled to return to full duty on day tours August 30, but took the month of September and most of October 1997 off on sick leave. (Messar Decl. ¶ 18, Ex. M.) On December 24, 1997, Dr. Gerald Gaughan wrote that Querry was under his care for a back injury with left leg radiating pain and was totally disabled and unable to work. (Sussman Aff. ¶ 42, Ex. 42.) On December 26, 1997, Querry was ordered suspended without pay for 30 days for "being absent from duty since December 2, 1997." (Id.¶ 41, Ex. 41.)

Plaintiff now claims that injured women in the Department were treated differently from injured men and that she was singled out for adverse employment treatment based on her status as an injured woman. The City defendants claim that they have proffered a legitimate, non-discriminatory reason for each of their actions as regards the plaintiff, and claim to have identified injured male officers who were subjected to the same treatment of which plaintiff complains.

## DISCUSSION

### I. *Summary Judgment Standard*

The City defendants move for summary judgment pursuant to Fed. R.Civ.P. 56. Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. *See Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997). In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the movant. *See id.* The court's role at this stage of the litigation is not to decide genuine issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Summary judgment may not be granted simply because the court believes the plaintiff will not be able to meet her burden of persuasion at trial. *Danzer v. Norden Sys.,* 151 F.3d 50, 54 (2d Cir.1998).

Where, as here, the employer's intent is at issue, the courts are particularly cautious in granting summary judgment. *See id.; Gallo,* 22 F.3d at 1224. Because direct evidence of intentional discrimination is rarely found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Id.; see also Rosen v. Thornburgh,* 928 F.2d 528, 533 (2d Cir. 1991). Nonetheless, summary judgment is appropriate where plaintiff's case rests on nothing more than conclusory allegations of discrimination. *See Schwapp,* 118 F.3d at 110.

### II. *Shifting Burdens of Proof*

The disposition of an employment discrimination action, whether brought pursuant to Title VII or § 1983, follows the three-step procedure set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1822, 1824–26, 36 L.Ed.2d 668 (1973). *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 2747 n. 1, 125

L.Ed.2d 407 (1993) (assuming *McDonnell Douglas* framework applies to § 1983 claim); *Fisher v. Vassar College,* 114 F.3d 1332, 1335–36 (2d Cir.1997), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998), *and reh'g denied,* — U.S. —, 118 S.Ct. 1341, 140 L.Ed.2d 501 (1998). First, the aggrieved employee bears the burden of establishing a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. This burden is a light one. *See Chertkova v. Connecticut Gen. Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996). If the plaintiff successfully establishes a prima facie case, there is a rebuttable presumption of discrimination and the burden of going forward then shifts to the employer to articulate some legitimate, non-discriminatory reason for the action. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. at 1824. If the employer does so, the presumption of discrimination "simply drops out of the picture," *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. at 2749, and the plaintiff must show that it is more likely than not that the employer's actions were motivated, at least in part, by discrimination. *See Stratton v. Department for the Aging for the City of New York,* 132 F.3d 869, 879 (2d Cir.1997). "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. at 2752.

### III. *Claims of Disparate and Adverse Treatment*

▪ Plaintiff's claims are grounded in both § 1983 and Title VII. A § 1983 claim has two essential elements: (1) defendant acted under color of state law; and (2) as a result of defendant's actions, plaintiff was denied her federal statutory rights or her constitutional rights or privileges. *See Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998). "An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other

similarly situated employees." *Id.* at 245. Plaintiff need not show that a discriminatory reason was the only reason for the disparate treatment, just that it is was a substantial or motivating one. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

▪ To make out a prima facie case for disparate treatment under Title VII, the plaintiff must show that: (1) she belongs to a protected class; (2) she suffered adverse employment action; and (3) the adverse action arose under circumstances giving rise to an inference of discrimination. *Yaba v. Roosevelt,* 961 F.Supp. 611, 617–18 (S.D.N.Y.1997). The burden of establishing a prima facie case is de minimis. *Chambers v. TRM Copy Centers Corp.,* 43 F.3d 29, 37 (2d Cir.1994).

Plaintiff alleges that she received disparate treatment from similarly-situated injured males and was targeted for adverse treatment based upon her gender in that: (1) she was forced to return to work despite advice from her private physicians to the contrary; (2) she was subjected to multiple medical examinations and her private physicians were intimidated into changing their medical opinions; (3) her § 207–c benefits were terminated; (4) she was assigned to the midnight tour despite having worked day tours for many years; and (5) she was not returned to her special duty assignment because of her status as an injured female officer.

### A. *Orders to Return to Work*

Querry claims that she repeatedly was ordered to return to duty despite the opinions of her private treating physicians that she was too disabled to work, or forced to work full eight-hour tours despite her physicians' advice that she only work four-hour tours. According to Querry, similarly-situated males on the force were not "rush[ed] back to service." Defendants rebut plaintiff's prima facie showing of discrimination with evidence that MCU's poli-

cy of ordering injured officers to return to work based on the findings of an Oracle examination despite the officers' own doctors' opinions to the contrary was applied in a gender-neutral fashion. The City defendants claim that this procedure was part of an effort to "get officers back to work sooner and to reduce sick and disability leave." (Messar Decl. ¶ 4.)

In one case, a male officer's personal physician found that the officer "continue[d] to be disabled" as a result of an on-duty accident one year earlier when the officer slipped and fell on a snow-covered walkway. Less than one month after the private physician issued his report, on January 23, 1997, the officer was examined by an Oracle orthopedic surgeon who stated that "there is no question that this claimant may return to light duty type police work." Plaintiff makes much of the fact that this officer was not actually ordered to return to work on light duty until March 6, 1997. However, a memorandum from the MCU shows that the officer took 25 days of vacation time prior to returning to work. Querry does not complain that she was denied vacation time—in fact, she states that after being ordered to return to work on July 2, 1996, she worked until August 5, 1996, then took a scheduled vacation until September 2, 1996. (Pl.Aff.¶¶ 17–19.)

Similarly, defendants claim that a second male officer was examined by an Oracle physician on December 23, 1996 and cleared for light duty. The following day, the officer's treating physician wrote to the police department that the officer was "totally disabled" and would be re-evaluated on January 9, 1997 regarding his ability to work. Although the records are unclear as to when the officer returned to work, Messar states in his declaration that the officer "returned to work on January 2, 1997 after taking several days of vacation." (Messar Decl. ¶ 7.)

Plaintiff states that Messar's assertion that this officer was returned to work on January 2 is unsupported by the records submitted by City defendants. Plaintiff is correct, in so far as the records submitted by the City defendants regarding this officer are incomplete and neither confirm nor deny Messar's assertion. Nonetheless, Messar made this statement under penalty of perjury and declared that the information therein was based on his personal knowledge and following a review of Department records. Plaintiff has come forward with no evidence to refute Messar's statement. Accordingly, we will credit his declaration. Because this officer was returned to work before his treating physician advised, he was treated similarly to plaintiff.

Plaintiff identifies a third male officer, a sergeant, who she claims was treated more leniently than she was. The sergeant, who had an on-duty car accident, was examined by an Oracle physician on August 13, 1996. The physician found that the sergeant "may return to work in a light duty capacity, sedentary desk job is approved" but could make no guess as to when the sergeant could return to full duty. However, no light-duty post was available for the sergeant and he was ordered to remain off-duty. The sergeant was ordered to return to work on September 26, 1996. On September 25, 1996, the sergeant's private physician found that the sergeant would be unable to work at least until his next appointment, scheduled for October 9, 1996. An MCU memorandum states that an Oracle physician examined the sergeant on September 27, 1996 and found him fit for light duty and the sergeant was ordered to return to work on September 30. From Department records, it is clear that—similarly to plaintiff—the sergeant was ordered to return to work despite contrary advice from his private physician in September 1996.

 Plaintiff also complains that the sergeant was not immediately returned to work despite an Oracle exam finding him fit for duty in August 1996, while plaintiff was contemporaneously ordered back to service. However, "[f]or evidence relating to other employees to be relevant,

those employees must be situated similarly to plaintiff." *Mazzella v. RCA Global Communications, Inc.,* 642 F.Supp. 1531, 1546 (S.D.N.Y.1986), *aff'd,* 814 F.2d 653 (2d Cir.1987). Records show the sergeant was not immediately returned to work in August because there was no light-duty post available for him. Plaintiff and the sergeant were not similarly situated. The sergeant was of higher rank than the plaintiff and his duties were different from plaintiff's. *See id.* at 1547. According to Messar, an appropriate light-duty post was unavailable for an officer of his rank until Messar himself created a position for the sergeant in the MCU in September. (Messar Decl. ¶ 11.)

 Following the *McDonnell Douglas* burden-shifting analysis, the evidence detailed above rebuts the initial presumption of discrimination afforded plaintiff. The City defendants have offered proof that injured male officers were subjected to being returned to work despite contrary findings by their physicians. Furthermore, the defendants have stated a rational explanation for doing so—that in the face of a generous leave policy, one that included preferential tax treatment for those officers who were disabled on the job and unlimited time off for illness with pay, a third-party medical opinion was necessary. Plaintiff has not proffered any evidence to establish that the City defendants' explanations of their actions were merely a pretext for discrimination. As a matter of law, she is unable to carry her burden of proving discrimination. Accordingly, the City defendants are entitled to summary judgment on plaintiff's claim she suffered discrimination as a result of being ordered to return to work.

**B. *Multiple Medical Examinations and Alleged Intimidation of Physicians***

 As discussed *supra* in Part A, male officers who claimed disabilities were subjected to multiple medical examinations just as plaintiff was in accordance with the Department's procedure for handling claims of disability. One male officer, for example, was ordered to return to work on light duty following an examination December 26, 1997 by an Oracle orthopedic surgeon. The officer reported for duty on December 30 and complained of pain from the prior injury. That day he was seen by another Oracle surgeon who found the officer unable to work light duty. The only time plaintiff saw an Oracle physician was after she claimed she was too injured to work or after one of her private physicians found that she could not work, or that she should be placed on light duty.

Querry also claims that her personal physicians "were repeatedly contacted, questioned and pressured by MCU officers regarding her medical status." (Pl.'s Br. at 10.) Plaintiff alleges that the City defendants did this "all with a view towards: obtaining medical reports requiring Plaintiff to return to work even though it was medically inappropriate; putting coercive pressure on Plaintiff to resign and/or retire; deliberately denying Plaintiff any accommodation much less reasonable accommodations for her disabilities." (Compl.¶ 28.)

Plaintiff has offered evidence that MCU officers contacted her physicians; however, there is no evidence that plaintiff's physicians were intimidated or that they changed their diagnoses as a result of these visits. In a memorandum to Messar, a police officer stated that at Cavorti's request, he spoke to Querry's private cardiologist asking the doctor to clarify a letter in which the doctor found Querry physically unable to resume her duties as a police officer. The officer asked the doctor whether Querry could work light duty, and the doctor, true to his original opinion, responded that because he found a direct correlation between her job stress and condition, he recommended she remain out of work for about six weeks. (Sussman Aff. Ex. 27.)

Department records also show that an MCU officer contacted plaintiff's psychia-

trist Dr. Werboff by telephone. According to the record, Dr. Werboff reiterated that plaintiff was unable to resume her duties at that time. (Sussman Aff. Ex. 31.) Dr. Werboff submitted a declaration in which he states that "[e]ach time that I submitted ... a report, I was contacted by officers from the MCU who requested 'clarification' of the reports, despite the fact that the reports themselves were quite specific ...." (Werboff Decl. ¶ 2.) Dr. Werboff states that officers from the MCU contacted him "frequently throughout 1997 and 1998, not just to request status reports but to constantly question me regarding the information I had submitted in such reports." (Id. ¶ 3.) However, Dr. Werboff does not state that the officers intimidated him, nor is there any evidence he changed his mind regarding plaintiff's ability to work as a result of their frequent contacts with him.

Cavorti testified that he and another officer visited one of plaintiff's private physicians to investigate what the MCU thought was a suspicious note from the physicians's office and to confirm the dates that plaintiff received physical therapy. (Cavorti Dep. at 40.) Cavorti also testified that he visited an injured male officer's doctor to inform the doctor of the availability of light-duty assignments. (Id. at 45.)

Plaintiff has failed to show that she was treated differently than similarly-situated male officers as to MCU's communications with her physicians. Even if her physicians were contacted more frequently than the private physicians of injured male officers, plaintiff has failed to substantiate her claim that her doctors changed their opinions or that her medical care was affected by these contacts. Accordingly, defendants are entitled to summary judgment as to plaintiff's claims regarding the frequency with which she was ordered to

undergo Oracle medical exams and MCU's contact with her physicians.

### C. *Denial of Disability Benefits*

Plaintiff claims that her § 207–c benefits were wrongfully terminated, and that during the time that Messar was captain of the MCU and Christopher was police commissioner, the only other officer whose § 207–c benefits were terminated was another injured female, Coralinda Colantonio. In a letter dated September 25, 1996, Christopher informed plaintiff that as of September 23, 1996, her benefits were terminated due to her refusal to perform light duty pursuant to N.Y. Gen. Mun. Law § 207–c(3).[2] Plaintiff claims that she reported to work for each of her regularly-scheduled tours, but was hindered from completing a full eight-hour day due to back pain. Colantonio affirmed in a separate lawsuit that in April 1997, the Department terminated her § 207–c benefits after she refused to have a second operation on her shoulder.

■ The City defendants claim that plaintiff did not perform her light-duty assignments in accordance with N.Y. Gen. Mun. Law § 207–c(3) and that injured male officers also lost their § 207–c benefits as a result of their refusal to work light duty. However, neither of the two male officers the City defendants offer in rebuttal had their benefits terminated while Messar led the MCU and Christopher served as commissioner. One officer's benefits were terminated in 1995, (Sussman Aff. Ex. 47), the other's in 1999. (Messar Decl. Ex. K.) Material issues of fact remain regarding whether the Department was justified in terminating plaintiff's benefits for failure to perform light-duty assignments, and, even if the Department was so justified, whether the Department's

**2.** A police officer who is "in the opinion of [a police department's] health authorities or physician, unable to perform his regular duties as a result of ... injury ... but is able, in their opinion, to perform specified types of light police duty, payment of the full amount of regular salary or wages ... shall be discontinued with respect to such policeman, if he shall refuse to perform such light duty if the same is available and offered to him." N.Y. Gen. Mun. Law § 207–c(3).

policy regarding termination of benefits was selectively enforced against injured female officers. Accordingly, the City defendants' motion for summary judgment as to this claim is denied.

### D. *Assignment to the Midnight Tour*

Plaintiff complains that when she was ordered to return to work in July 1997, she was ordered to work the midnight tour despite having worked the day shift since 1988. Plaintiff points to the medical records of twelve injured male officers who, when they returned to work, were not returned to the midnight tour when that tour was not their regular tour of duty. Messar stated in a deposition that because plaintiff's doctor recommended she not be returned to the Communications Division, he followed "normal procedure" and returned plaintiff to her "home precinct," the Second Precinct, where the desk officer's position was open. (Messar Dep. at 58.)

Messar also states in his declaration that men who were not assigned to midnight tours "immediately preceding their medical leave" were assigned to midnight tours upon their return to work. (Messar Reply Dec. ¶ 22.) In contrast, plaintiff claims that she never had been assigned to midnight tours prior to her leave. Personnel records submitted by the City defendants regarding the male officers' return to the midnight shift are ambiguous as to their prior shift details.

■ It is a question for the jury whether Messar's explanation constitutes pretext for gender discrimination in light of the evidence submitted by plaintiff that many similarly-situated male officers were not assigned to midnight tours following medical leave. Messar's ambiguous statement that the male officers brought forth by the City defendants in rebuttal were not assigned to midnight shifts "immediately, preceding" their time off invokes doubt as to whether these officers were situated similarly to plaintiff, as plaintiff had always worked day tours. According-ly, the City defendants' motion for summary judgment as to this claim is denied.

### E. *Failure to Return Plaintiff to the Forensics Laboratory*

Plaintiff claims that she was not returned to her position in the Forensics Laboratory after she was removed from this special duty assignment during a personnel shortage in 1995, but male officers were returned to their special duty assignments if they so wished. On January 6, 1995, plaintiff was transferred from the Forensics Laboratory to patrol at the same time seven other officers, five of them men, were transferred from their special duty assignments. Plaintiff claims that while the male officers were allowed to return to their former posts, she was not offered the same opportunity.

The City defendants claim that plaintiff's gender was not a factor in the decision not to return her to the laboratory. They state that her position was never filled. According to defendants, the only uniform officer working in the Forensics Laboratory after plaintiff's transfer was the supervising lieutenant, Peter Pizzola, who holds a Ph.D. in forensic science, while the remaining staff was civilian, all of whom hold a bachelor of science degree in forensic science, and two of whom are women. (Def.s' Br. at 9.) The City defendants claim that the civilian employees are paid less than a police officer in the same position, so that it would not be cost-effective to put a uniformed officer in the laboratory. Pizzola states that in part for that reason, he recommended to the Department in November 1998 that he be reassigned, and that his civilian assistant take over as director of the lab. His recommendation was accepted. (Pizzola Decl. ¶ 2.)

■ Plaintiff was commended for her work in the laboratory. Although City defendants offer evidence that some women were transferred to special duty assignments from patrol, (Pizzola Decl. ¶ 3), records show that the other two women

officers reassigned during the patrol shortage, as was plaintiff, did not return to their former posts. (Sussman Aff. Ex. 43.) Whether the City defendants' explanation for their failure to return plaintiff to the Forensics Laboratory is a pretext for gender discrimination is a question for the jury in light of the evidence plaintiff brought forward that she was well-qualified for her position and that all reassigned men had an opportunity to return to their special assignments while plaintiff did not. Therefore, the City defendants' motion for summary judgment as to plaintiff's claim regarding the City defendants' failure to return her to her special duty assignment is denied.

## IV. *Hostile Work Environment Claim*

 A plaintiff can establish a Title VII violation by proving gender discrimination has created a hostile or abusive work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Hostile work environment claims are also actionable pursuant to § 1983. *See Annis*, 36 F.3d at 254 ("[H]arassment that transcends coarse, hostile and boorish behavior can rise to the level of a constitutional tort.").

 Whether a work environment is abusive or hostile is determined by looking at the workplace both from an objective and a subjective viewpoint. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). No magic formula exists for determining whether a hostile environment exists, although the following factors may aid the analysis: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. at 371. The impact of the alleged harassment on the employee's psychological well-being is relevant to the subjective prong of the test. *See id.* Ulti-

mately, the analysis turns on the totality of the circumstances. *See Kotcher v. Rosa and Sullivan Appliance Center, Inc.*, 957 F.2d 59, 63 (2d Cir.1992). The application of the specific instances of discrimination alleged by plaintiff to the standards governing the existence of discrimination is a mixed question of law and fact "especially well suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue." *Richardson v. New York State Dept. of Correctional Service*, 180 F.3d 426, 437–38 (internal quotations and citation omitted).

 Here, plaintiff has made several allegations that, taken as a whole, could convince a reasonable juror that she was subjected to a hostile work environment. As discussed above, plaintiff claims the only injured officers whose disability benefits were terminated while Messar and Christopher were empowered to do so were plaintiff and another woman. She further claims that defendants placed her on a midnight tour even though she had always worked a day tour because of her status as an injured female. Plaintiff also asserts defendants removed her from her special duty post in the Forensics Laboratory and failed to return her to that position despite the fact similarly-situated men in the department who were placed on patrol had the opportunity to return to their special duty assignments and despite the fact plaintiff received commendations for her work in the lab.

In addition, plaintiff claims that Cavorti told her, knowing that the Department's contractual obligations were otherwise, that she would not be paid for her full tour of duty if she left work early. (Pl.'s Br. at 7.) Plaintiff also claims that Messar and Cavorti forbid plaintiff to drive her own car even after her physician cleared her to do so. The City defendants counter that they forbid plaintiff to drive her car after speaking with the City's corporation counsel because "there was a liability issue involved" due to the medications she was

taking. (Messar Dep. at 40.) However, Messar testified that he never lifted the restriction. (Id. at 43.) The City defendants' motive in this instance is a question of fact for the jury.

Plaintiff has offered evidence that, subjectively, she experienced a hostile work environment related to her status as an injured female officer. As discussed above, an Oracle psychiatrist found that plaintiff had anxiety disorder and panic attacks associated with her fear she would lose her disability status and benefits. Her cardiologist recommended she refrain from working because the chronic anxiety and heart condition for which he was treating her was in direct correlation with job stress. Plaintiff's private psychiatrist Dr. Werboff states in his declaration: "In the course of evaluating Ms. Querry, I determined that her symptoms of panic and anxiety were causally related to her treatment by the City of Yonkers Police Department, and specifically its Medical Control Unit." (Werboff Decl. ¶ 1.)

Because material issues of fact remain with regard to plaintiff's hostile work environment claim, defendants' motion for summary judgment as to this claim is denied.

## CONCLUSION

For the foregoing reasons, the Court grants the City defendants' motion for summary judgment on plaintiff's Title VII and § 1983 claims with respect to plaintiff's claims that: (1) she was forced to return to work despite her doctors' advice to the contrary; and (2) that she was obligated to undergo multiple medical examinations and her physicians were intimidated by MCU officers. With respect to plaintiff's claims regarding (1) the termination of her disability benefits; (2) her assignment to midnight tours; (3) the City defendants' failure to return her to the Forensics Laboratory; and (4) the alleged

hostile work environment, the City defendants' motion is denied.

SO ORDERED.