Barbara ANNIS, Plaintiff–Appellee,

v.

COUNTY OF WESTCHESTER, Ernest J. Colaneri, and Anthony M. Mosca, Defendants–Appellants.

Nos. 348, 96–9647(L), 96–9705(CON).

United States Court of Appeals, Second Circuit.

Argued Nov. 14, 1997.

Decided Jan. 28, 1998.

Marilyn J. Slaaten, Westchester County Attorney, and Linda M. Trentacoste, Assistant County Attorney, White Plains, NY, attorneys for defendants-appellants County of Westchester and Ernest J. Colaneri. Bruce Bendish, Goodrich & Bendish, White Plains, NY, attorney for defendant-appellant Anthony M. Mosca.

Jonathan Lovett, White Plains, NY, attorney for plaintiff-appellee.

Before VAN GRAAFEILAND, CARDAMONE, and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Following a jury trial in the United States District Court for the Southern District of New York (Connor, J.), plaintiff was awarded a total of $541,001 in compensatory and punitive damages for violation of her constitutional right to be free from gender discrimination. Upon the defendants' motion for judgment as a matter of law or for a new trial, the district court denied the former, but granted a remittitur, which the plaintiff accepted in order to avoid a new trial solely on damages, reducing the damage award to a total of $225,001. Defendants now appeal. For the reasons that follow, we affirm as to liability but vacate and remand for a new trial on both compensatory and punitive damages.

### Background

Plaintiff, Barbara Annis, was a police officer in Mount Vernon, New York, a municipality in Westchester County, from April

1977 to January 1984. She transferred to the Westchester County Department of Public Safety ("the County police" or "the County") in January 1984, and was promoted to sergeant in February 1988 and to lieutenant in July 1991.

Defendant Anthony Mosca was, first, the commissioner of the Mt. Vernon Police Department from January 1981 to approximately June 1984, and, then, commissioner of the County police from July 1984 to January 1992. Defendant Ernest J. Colaneri was the deputy commissioner of the County police from January 1993 to January 1996. Before succeeding Mosca, Colaneri was deputy commissioner for approximately three years.

In May 1993, Annis sued Mosca, Colaneri and the County in the United States District Court for the Southern District of New York (Conner, *J.*) under 42 U.S.C. §§ 1983 and 1985, alleging that she suffered sex discrimination while serving in both Mt. Vernon and the County.

We read the record in the light most favorable to Annis. *See Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir.1993).

### A. *The Mt. Vernon Police Department*

#### 1. *April 1977 to December 1980*

The culture of the Mt. Vernon Police Department during Annis's first few years of service was, at times, sexist and, at times, lascivious. Officer Thomas D. Hanrahan, a Mt. Vernon patrolman from 1972 to 1993, testified that officers attended strip shows performed on top of squad cars parked behind a local school, permitted visits to the station house by a prostitute who would perform oral sex for the officers manning the desk, watched "pornographic" films in the squad room, and disseminated dirty pictures of officers *in flagrante delicto*. Annis offered similar testimony.

Even though most of these sordid acts predated Mosca's tenure as Mt. Vernon Police Commissioner, the district court admitted this testimony, overruling the defendants' motions *in limine* and objections at trial. The court did this because of the possibility that Annis might have told Mosca about "this kind of incident" when Mosca became commissioner, and because "evidence of such acts might be admissible for the limited purpose of assisting the jury in construing the intent of subsequent acts." The great bulk of Annis's testimony about the environment at Mt. Vernon was thus admitted.

#### 2. *January 1981 to July 1984*

In January 1981, Mosca became commissioner, and he introduced himself to Annis in sophomoric fashion. Spotting her standing with several male officers just inside the entrance of the station house, he walked through the entrance with the fly of his pants conspicuously unzipped, got her attention (as well as the attention of the male officers), and, when one of the male officers pointed out Mosca's folly, said, "I forgot to zip up my fly before I left the house this morning. I guess I better do it now." Then, instead of turning around, he asked Annis to turn around while he zipped up.

Later in 1981, Mosca called Annis into his office to discuss why she had issued so few summonses. When Annis offered an explanation, Mosca got angry, asking her why she had a "bad attitude." When Annis mentioned the zipper incident, Mosca uttered a vile sexual epithet, said he would "bury" her, and asserted that he was opposed to "women's liberation sh-t."

Around the same time, Annis overheard Mosca explaining to a group of officers that he "never really believed in women being cops or women being in police work." About a year later, Mosca angrily chided Annis for failing to salute him. As it happens, both Annis and Mosca were in civilian clothing, and, in light of department policy, she was therefore not required to salute. As a result of this incident, Mosca sent a memorandum to the deputy chief of the department, noting Annis's failure to salute. Also in 1982, Annis spotted a memorandum from Mosca instructing subordinates that she "was to be assigned the least desirable post."

In December 1983, Annis asked to be transferred to the County police, but Mosca denied this request. Annis resigned soon thereafter and was immediately hired by the

County anyway. Mosca joined the County police about six months later.

## B. *The County Police*

### 1. *January 1984 to April 1990*

From January 1984 through November 1987, Annis worked in the County police's "sex crimes unit," an assignment with which she was unsatisfied. The unit's basic purpose was to assist local police departments by providing officers—often female—to comfort and interview female victims of sex crimes. Annis was frustrated because members of the sex crimes unit were not permitted to make arrests, and because, as she perceived it, she was working on the unit only because she was a woman. Annis requested a transfer out of the unit on "numerous occasions."

While Annis was formally assigned to the sex crimes unit, she also did other police work. In 1985 or 1986, for example, Mosca approved Annis's participation with the Mamaroneck Police Department in an undercover narcotics investigation. During that time, she also worked in the general investigations unit and did surveillance and narcotics work.

In 1985 Mosca nominated Annis for the International Association of Women Police Award as "Woman Police Officer of the Year." He did this because he "thought she was doing a good job."

In the spring of 1987, Annis complained to the Police Benevolent Association ("PBA") about her mistreatment by the County Police. Mosca received a memorandum from his deputy commissioner, Thomas J. Sweeney, detailing what the president of the PBA had reported regarding Annis's complaints. Mosca told Sweeney "to look into any issues not resolved."

Also in the spring of 1987, Annis took the County's exam to get on the list to be promoted to sergeant. She did not make the list, however, because her application did not include documents to prove her prior service with Mount Vernon. Annis was upset with this turn of events because she had worked with Mosca at Mt. Vernon and thus felt his inexplicable failure to inform personnel of her employment history was a conspicuous omission. A personnel official testified, however, that the "normal practice and procedure" is to require documentation. Indeed, six other members of the County police were similarly penalized for lack of documentation.

In June 1987, Mosca signed a memorandum recommending that Annis's request to be transferred from the sex crimes unit to the warrant squad be held for consideration until it could be determined if there was room in the warrant squad and if Annis's position on the sex crimes unit could be quickly filled.

In the summer of 1987, Annis secured the appropriate records for her promotion, and in February 1988, she was promoted to sergeant. Annis acknowledged that no person below her on the eligibility list was promoted over her.

Annis was sworn in as a sergeant while wearing a dress rather than a uniform because, despite repeated requests over the years, she had not been issued a uniform.

### 2. *May 1990 to May 1993*

In August 1990, Mosca became "very irate" at Annis, yelling and "making hand gestures" because she failed to sign the desk blotter when she "came in from the road." While written procedures do require a sign-in, a knowledgeable lieutenant admitted "that was not a procedure that we were following. I had never heard of that before."

In November 1990, there was another "failure to salute" episode, this one involving Colaneri. Annis testified that she failed to see him. Colaneri testified that she did see him, but turned her back on him. Although he said nothing at the time, Colaneri complained to Mosca, who told Colaneri to "write her up." Colaneri did so, filing an "Administrative Internal Complaint Report" describing the incident. Colaneri also directed two Internal Affairs supervisors to investigate the incident. Annis received a "warning letter" with regard to "proper military courtesy," including her failure to salute. There is ample evidence, however, that the rule about saluting is rarely, if ever, enforced. Colaneri even admitted that on previous occasions

when subordinate officers failed to salute him, he had done "nothing."

In December 1990, another incident arose from Annis's not signing the desk blotter. Seeing that Annis had failed to sign in when she entered headquarters, Mosca told her in a loud, aggravated voice that she was a "constant f-ck up."

In January 1991, Annis was assigned to the Yonkers district office at the Department of Social Services ("DSS"). Yonkers is considered a "punishment" assignment, one of the "worst assignments" for a sergeant. Colaneri conceded as much. Mosca "became aware" that Annis did not want to be assigned there. Similarly, when Mosca assigned Annis to Yonkers, Colaneri knew that she did not want the job, because Annis had told him so.

In early 1991, Annis attended a meeting at the Police Academy, sitting near the front of the room. When Mosca entered, Annis alone saluted him, but Mosca did not salute back. He then addressed the officers, "Good afternoon, gentlemen," looking directly at Annis.

In July 1991, Annis was promoted to lieutenant. Despite her promotion, Annis remained at Yonkers, which had always been a sergeant's post. Shortly after Annis was promoted, Mosca changed the post to a lieutenant's position. This made her the only lieutenant in the patrol division who supervised just patrol officers, and no sergeants.

Mosca kept Annis at Yonkers "because there was a very problematic office and because most of the clients there were female clients and Sergeant Annis, at the time, when she was a supervisor there, did a very good job." He explained that it was the "consensus within our command staff" that she remain there, and Deputy Commissioner Colaneri was part of that staff. Mosca acknowledged that "the only reason" he kept Annis at Yonkers was because she is female. Colaneri conceded that, from a "police perspective," it is "unusual to have a lieutenant assigned as the superior officer with just a few police officers subordinate to her."

On July 10, 1991, Mosca directed that the supervising lieutenant at Yonkers would no longer be eligible to incur overtime pay.

Finally, at a farewell party for an officer around 1993, Mosca said to Annis and another female officer that he "never did trust a woman who carried a gun."

Annis testified that she was humiliated by the discrimination she endured. While she did not seek medical or psychiatric treatment, she did seek, and continued to seek at the time of trial, counseling to discuss the emotional distress these events caused her.

## C. Before Trial

The County and Colaneri moved to dismiss the complaint on two grounds: (1) Annis could not sue for gender discrimination on the basis of § 1983 alone, but had to couple her claim with a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.;* and (2) she was unable to add a Title VII claim because she had failed to comply with that statute's procedural requirements.

The district court granted the motion. On appeal, we vacated and remanded, holding that sex discrimination is covered by § 1983, and that Annis could sue under § 1983 alone, unencumbered by Title VII. *See Annis v. County of Westchester,* 36 F.3d 251, 254–55 (2d Cir.1994).

On remand and in preparation for trial, the district court heard argument on the defendants' *in limine* motions. Defendants sought to preclude Annis from introducing evidence of events that occurred more than three years before she filed her complaint in May 1993, as the three-year statute of limitations under § 1983 and § 1985 actions had expired. *See Cornwell v. Robinson,* 23 F.3d 694, 703–04 (2d Cir.1994). Annis argued that, despite its remoteness, such evidence was admissible to establish a "continuing constitutional violation" by the defendants. The court denied the defendants' motions.

## D. The Verdict and Post– Trial Proceedings

At the close of trial, Annis withdrew her § 1985 cause of action, and Mosca renewed his argument that the pre–1981 evidence be stricken as irrelevant; he also argued that the pre-May 1990 evidence failed to establish a continuing violation. The district court

concluded that the evidence was sufficient to give the continuing-violation question to the jury, but instructed the jury that Mosca's liability could be premised only on discrimination that occurred when Mosca and Annis were together at Mt. Vernon.

The jury awarded Annis $50,000 in compensatory damages and $250,000 in punitive damages against Mosca; $1 in compensatory damages and $25,000 in punitive damages against Colaneri; and $216,000 in compensatory damages against the County.

The defendants moved pursuant to Fed. R.Civ.P. 50(b) for judgment as a matter of law, for a new trial under Rule 59 or remittitur. The district court denied the defendants' motions for judgment as a matter of law, pointing to events occurring between 1981 and May 1993 as evidence of the defendants' liability. *See Annis v. County of Westchester*, 939 F.Supp. 1115, 1118–20 (S.D.N.Y.1996).

The district court, however, granted the motions for a new trial on damages, unless Annis agreed to a remittitur. *See id.* at 1121–22. Annis agreed to the remittitur, and the court entered judgment as follows: against Mosca, $50,000 in compensatory damages and $100,000 in punitive damages; against Colaneri, $1 in compensatory damages and $25,000 in punitive damages; and against the County, $50,000 in compensatory damages.

Defendants appeal, contending that (1) the district court erred by failing to rule as a matter of law that the evidence of events occurring before May 1990 was insufficient to establish a continuing violation on the part of the defendants; (2) the court abused its discretion by admitting evidence of events that occurred before May 1990; (3) the court erred in refusing to grant their motions for judgment as a matter of law (even based on events occurring *after* May 1990); and (4) the damage awards—even after Annis accepted the remittitur—remain unfair and unreasonable.

## DISCUSSION

■ A § 1983 claim has two essential elements: (1) the defendant acted under color of state law; and (2) as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges. *See Eagleston v. Guido*, 41 F.3d 865, 872 (2d Cir. 1994).

■ An employee is denied her equal protection right to be free from gender discrimination when she is treated differently from other similarly situated employees, thus suffering "disparate treatment because of gender." *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 144 (2d Cir.1993); *see Sims v. Mulcahy*, 902 F.2d 524, 538 (7th Cir.1990); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir.1990). A supervisor may be liable when he has been deliberately indifferent to an employee's complaints of sex discrimination. *Cf. Southard v. Texas Bd. of Criminal Justice*, 114 F.3d 539, 553–54 (5th Cir.1997) (chief of police who, upon receiving complaints from employee of sex discrimination, asked the director of personnel to investigate questions raised by investigative report of an outside agency, was not deliberately indifferent).

■ In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n. 1, 113 S.Ct. 2742, 2747–48 n. 1, 125 L.Ed.2d 407 (1993) (assuming that the same burden-shifting analysis applies to both § 1983 and Title VII claims of discrimination); *see also Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994) (citing cases).

We first examine whether the evidence of events that occurred before May 1990 established a continuing violation of Annis's constitutional rights. We find that the evidence was insufficient in this regard and conclude that the district court abused its discretion in admitting the evidence. Nevertheless, we further conclude that a reasonable jury could have imposed liability on the defendants based just on the evidence of events that occurred from May 1990 to 1993. Finally, because we cannot ascertain what fraction of the damage awards is attributable to the time-barred events of discrimination, and be-

cause the evidence of Annis's emotional distress is insufficient to warrant an award of compensatory damages, we vacate and remand for a new trial on damages.

### A. Continuing Violation

■ The continuing-violation exception "extends the limitations period for all claims of discriminatory acts committed under [an ongoing policy of discrimination] even if those acts, standing alone, would have been barred by the statute of limitations." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2d Cir.1997). We conclude that, as a matter of law, the actions from July 1984 to April 1990 of which Annis complains were not instances of gender-based discrimination, and, accordingly, are not actionable.

First, Annis testified that she was unsatisfied with her work in the sex crimes unit from 1984 to 1987, in particular because she was not permitted to make arrests and because she felt she was on the unit only because she is female. Mosca conceded that "we preferred female detectives in the sex crimes unit," but noted that males worked there as well. Indeed, in the summer of 1985, two of the six members of the unit were male. The policy that sex crimes unit detectives could not make arrests, moreover, applied to both male and female detectives. Annis testified that, while she sought unsuccessfully to be transferred on several occasions, nevertheless she was permitted to participate in other police work. Furthermore, the only documented denial of her request for a transfer indicates that the denial was made based on a gender-neutral policy, and that in accepting this decision Mosca deferred to the individual who was in the best position to determine the feasibility of a transfer.

Second, in May 1987, Annis complained to the PBA about her dissatisfaction with the sex crimes unit (as well as other grievances that she does not pursue on appeal). When Mosca was made aware of Annis's complaints, he asked Deputy Commissioner Sweeney "to look into any issues not resolved." Although Mosca did not speak to Annis personally, it cannot be said that he was deliberately indifferent to her complaints. *See Southard,* 114 F.3d at 553–54 (5th Cir.1997).

Finally, in 1987 Annis took the County's sergeant's exam, but her name was not placed on the eligible list. The defendants' evidence, however, was that this occurred because her application did not include documents to prove her seniority based on her prior service with Mt. Vernon. At least six other officers were similarly delayed in having their names placed on the eligible-for-promotion list. Annis was promoted, moreover, in February 1988, and no person below her on the eligibility list was promoted before her. Furthermore, although she was sworn in in civilian clothes, the County presented evidence that a male officer promoted around that time, Christopher Calabrese, had similarly been deprived a uniform in time for his promotion ceremony.

■ Thus, even if we assume that Annis suffered sex discrimination during Mosca's tenure at Mt. Vernon (i.e. prior to 1984), there is, nevertheless, over a six-year gap, from January 1984 to April 1990, between discriminatory events. The discrimination Annis suffered before and after the gap cannot be joined as a "continuing violation." *See Selan v. Kiley,* 969 F.2d 560, 565–67 (7th Cir.1992) (two-year gap between discriminatory events "negates the contention that the acts were continuous or connected"); *Blesedell v. Mobil Oil Co.,* 708 F.Supp. 1408, 1417–18 (S.D.N.Y.1989) (no continuing violation in light of four-year interval between discriminatory incidents); *cf. Cornwell,* 23 F.3d at 704 (a three-year gap would not prevent a finding of continuing violation only because the employee was absent on account of illness).

Based on the record before us, the conclusion is inescapable that the evidence of events before May 1990 is simply insufficient to establish a continuing violation.

### B. Admission of Evidence of Pre–May 1990 Discrimination

Defendants contend that all evidence of discriminatory conduct before May 1990 should have been excluded. We agree. The probative value of the pre–1990 evidence was far outweighed by its tendency to confuse the jury and unfairly prejudice the defendants.

We review a district court's decision to admit evidence for abuse of discretion. *See Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 16 (2d Cir.1996). A new trial is warranted if the court's abuse of discretion clearly prejudiced the outcome of the trial. *See Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992). We will grant a new trial only if we are "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Pescatore*, 97 F.3d at 17 (internal quotations omitted).

Three discrete time periods are discernible in this case: (1) *1977 to 1980:* Annis works in Mt. Vernon, but neither Mosca nor Colaneri works there; (2) *1981 to April 1990:* Annis works in Mt. Vernon with Mosca, and then at the County Police with Mosca and, later, Colaneri; and (3) *May 1990 to May 1993:* Annis works at the County Police with both Mosca (until 1992) and Colaneri.

The district court allowed testimony regarding events at Mt. Vernon that occurred during the first period, even before Mosca arrived. This evidence should never have been admitted. The testimony described the Mt. Vernon Police Department as sexist and sexually undisciplined, an environment a reasonable jury would regard as deplorable. The jury would naturally associate these conditions with Mosca even in the absence of evidence of similar goings on during his tenure. The evidence was thus fiercely prejudicial. Further, the testimony was only minimally probative. The district court surmised that the evidence might bear on Mosca's intent in his dealings with Annis after 1981. In light of the high likelihood of prejudice, however, the court should have allowed the jury to infer intent based on the instances of discrimination that occurred when Mosca and Annis actually worked together, not at some earlier time.

Annis also produced substantial evidence relating to her treatment at the hands of the defendants in the second period, from 1981 to April 1990. Whether the district court abused its discretion in admitting this evidence is a much closer call.

The evidence was probative because Annis was trying to establish a continuing violation of her rights. On the other hand, Annis's complaint and pre-trial papers clearly indicated that most of the discrimination that harmed her occurred within the three-year statute of limitations. With regard to the source of Annis's alleged emotional distress, the evidence of events occurring from 1981 to May 1990 was thus irrelevant. This evidence, moreover, would naturally prejudice the jury's views with regard to the events occurring within the statute of limitations. We conclude that the court should not have admitted this evidence.

True, the district court did its best to minimize the prejudice caused by some of this evidence. The court instructed the jury that any testimony regarding events occurring before 1984 could not be used to prove either intent or damages against the County or Colaneri. The court also sought to narrow the jury's focus to Mosca's actions when he and Annis were working together. At that point, however, the well had been poisoned and, despite the court's best efforts, there was no way to decontaminate it.

Nevertheless, in light of the evidence of discrimination from May 1990 to 1993, we cannot say that the jury reached a "seriously erroneous result" based on the evidence that should not have been admitted, or that the verdict is a "miscarriage of justice."

### C. *Motions for Judgment as a Matter of Law*

The district court may grant a motion for judgment as a matter of law when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue . . ." Fed.R.Civ.P. 50(a). The question is "whether the evidence, viewed in the light most favorable to the non-movants without considering credibility or weight, reasonably permits only a conclusion in the movants' favor." *Jund v. Town of Hempstead*, 941 F.2d 1271, 1290 (2d Cir.1991) (internal quotations omitted).

#### 1. *Mosca and Colaneri*

Based solely on the evidence of misconduct committed between May 1990 and May 1993, a reasonable jury could have concluded the following:

Mosca and Colaneri singled out Annis on the basis of her gender in reprimanding her

for her failures to salute, in light of the testimony that officers regularly failed to salute each other and were not punished for it. Their actions constituted selective enforcement of work rules, *see Jones v. Gerwens*, 874 F.2d 1534, 1537–41 (11th Cir.1989); *Friedel v. City of Madison*, 832 F.2d 965, 972 n. 5 (7th Cir.1987); *Chescheir v. Liberty Mut. Ins. Co.*, 713 F.2d 1142, 1143–47 (5th Cir. 1983), which resulted in reprimands, cognizable adverse employment action, *cf. Southard*, 114 F.3d at 554.

Mosca's December 1990 statement that Annis was a "constant f-ck up"; his pointed "Good afternoon, gentlemen," looking directly at Annis; and his telling Annis that he "never did trust a woman who carried a gun" were gender-motivated, and constituted sexual harassment. Although Mosca's actions may not have been calculated to force her to quit, *see Annis v. County of Westchester*, 36 F.3d at 254, they are nevertheless a basis for recovery. *Cf. Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (defendant's gender-based ridiculing of plaintiff in front of coworkers is cognizable under § 1983).

Annis's assignment to Yonkers in 1991 was motivated by Mosca's discriminatory animus toward Annis, as he admitted that the "only reason" he assigned her there was because she is female. *Cf. Robbins v. Allstate Ins. Co.*, No. 96–1084, 1997 WL 176433, at *4 (6th Cir. April 10, 1997). In light of the fact that Yonkers was considered a "punishment post," a lieutenant had never been assigned there before, and the lieutenant at Yonkers did not even have a sergeant as a subordinate, Annis suffered a loss of stature as a lieutenant at Yonkers, and her duties and responsibilities were significantly diminished as a result of Mosca's keeping her assigned there. *See Shipbaugh v. Boys & Girls Clubs of Am.*, 883 F.Supp. 295, 298–99 (N.D.Ill. 1995); *cf. Crady v. Liberty Nat'l Bank and Trust Co.*, 993 F.2d 132, 135–36 (7th Cir. 1993). Colaneri, moreover, wrongly acquiesced in that 1991 assignment decision, keeping Annis in Yonkers after he became commissioner even though he knew why she had been assigned there and recognized how unusual a situation it was.

The timing of Mosca's decision to abolish the availability of regular overtime pay to the supervisor at Yonkers suggests that he did so to deprive Annis of overtime pay, and, in light of his other behavior, manifested gender-based discrimination. *Cf. Tindall v. Housing Auth. of Fort Smith, Ark.*, 762 F.Supp. 259, 263–64 (W.D.Ark.1991).

### 2. *The County*

A municipality is liable under § 1983 where the actions of which the plaintiff complains were undertaken by a municipal policymaker. *See Pembaur v. Cincinnati*, 475 U.S. 469, 481–85, 106 S.Ct. 1292, 1299–1301, 89 L.Ed.2d 452 (1986).

Here, the district court instructed the jury that, "[a]s a matter of law," Mosca and Colaneri, when each was commissioner, was a policymaker of the County, and the defendants do not challenge the propriety of this charge. In light of Mosca's actions, a reasonable jury could conclude that the County is liable for the injuries done to Annis beginning in May 1990.

### D. *The Damage Awards*

When "[i]t is not possible to ascertain what portions of the compensatory and punitive damages awards were attributable" to claims that were time-barred, the damages awards must be vacated. *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 485 (3d Cir.1997). Under these circumstances, we cannot simply offer the defendants a choice of a remittitur or a new trial. *See Hygh v. Jacobs*, 961 F.2d at 367 n. 1 (internal quotations omitted). Where "the record establishes that the jury's verdict on damages was not only excessive but was also infected by fundamental error, remittitur is improper." *Ramirez v. New York City Off–Track Betting Corp.*, 112 F.3d 38, 40 (2d Cir.1997). "In such a case, the judgment of the district court should be vacated and the cause remanded for a new trial on damages." *Id.*

Here, the pre-May 1990 evidence against Mosca, Colaneri and the County contributed to the jury's punitive damages award and, for that matter, may well have inflated the district court's offer of remittitur. This testimony "infected the jury's entire consideration" of punitive damages against Mosca and Colaneri, *Shu–Tao Lin v.*

*McDonnell Douglas Corp.*, 742 F.2d 45, 50 (2d Cir.1984), resulting in fundamental error. *See Shu–Tao*, 742 F.2d at 50; *cf. Ramirez*, 112 F.3d at 40.

Finally, we find that the only evidence of Annis's emotional distress—her own testimony—is insufficient to warrant an award of compensatory damages for that injury. She has not alleged any physical manifestations of her emotional distress, and, despite the discrimination, she remained a lieutenant with the County police. *Cf. Hetzel v. County of Prince William*, 89 F.3d 169, 171–73 (4th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 584, 136 L.Ed.2d 514 (1996). She testified that she needs and has had counseling, but introduced no affidavit or other evidence to corroborate her testimony. *Cf. Ramsey v. American Air Filter Co.*, 772 F.2d 1303, 1313–14 (7th Cir.1985). In short, her testimony fails to establish that she suffers from any concrete emotional problems. *Cf. Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1250–54 (4th Cir.1996) (citing cases), *cert. denied*, —— U.S. ——, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997).

Annis should be permitted to present other evidence of her emotional problems on remand.

## CONCLUSION

Although the evidence of events that occurred before May 1990 was insufficient as a matter of law to establish a continuing violation of Annis's constitutional rights, the verdict on liability is supported by evidence of events that occurred between May 1990 and May 1993. We vacate the entire award of both compensatory and punitive damages because we cannot ascertain what portions of the awards are attributable to time-barred events of discrimination, and because the evidence of Annis's emotional distress is presently insufficient to warrant an award of compensatory damages. Accordingly, we affirm as to liability but vacate and remand for a new trial on both compensatory and punitive damages.