MEMORANDUM ORDER DENYING DEFENDANT’S MOTION FOR JUDGMENT AS A MATTER OF LAW AND GRANTING DEFENDANT’S MOTION FOR REMITTI-TUR OF THE JURY AWARD OR, IN THE ALTERNATIVE, A NEW TRIAL.
 

 McMAHON, District Judge.
 

 Plaintiff, Eugene Kelleher, brought suit under 42 U.S.C. § 1983 for damages he sustained as a result of a strip search conducted by the Defendant, Denzil Fear-on, a New York State Trooper. The case was tried to a jury on January 18-19, 2000. The jury found that the Defendant was hable under Section 1983 for the deprivation of Plaintiffs constitutional rights and that Defendant was not entitled to qualified immunity. The jury awarded Plaintiff $125,000 in compensatory damages for emotional distress.
 

 Defendant has moved for judgment as a matter of law or, in the alternative, for a new trial or remittitur.
 

 Factual Backgound
 

 Plaintiff commenced this action under 42 U.S.C. § 1983 for alleged violations of his civil rights guaranteed by the Fourth Fifth, Eighth and Fourteenth Amendments. Plaintiff alleged,
 
 inter alia,
 
 that defendant, acting under color of state law, violated his constitutional right to be free from unlawful search and seizure during a 1997 vehicle traffic stop and automobile search, and the resulting arrest and subsequent strip search of the Plaintiff. Prior to the trial, all but Plaintiffs claims of false arrest and unlawful strip search were dismissed and/or dropped from the case.
 

 The case was tried to a jury on January 18 and 19, 2000. Plaintiff called three witnesses: Plaintiff; Reza Kusani; and Dr. Philip Barone. Defendant called two witnesses: Defendant and Trooper George Pearce, the other state trooper present at the traffic stop and search.
 

 Kelleher’s Testimony
 

 Mr. Kelleher testified that, on January 30, 1997, he was riding in the passenger seat of a car owned and driven by his friend, Reza Kusani, when the car was pulled over by a New York State Trooper patrol car on Route 6 in Brewster, New York. Trooper George Pearce was the first officer on the scene. He asked for Mr. Kusani’s identification. Mr. Kusani complied. Trooper Pearce took Mr. Kusani’s identification back to the patrol car, during which time a second trooper arrived. That trooper was Defendant, Denzil Fearon.
 

 Mr. Kelleher testified that, while he was still seated in Mr. Kusani’s car, Trooper Fearon approached him while he (Kelle-her) was sitting in Kusani’s car and asked for identification. Trooper Pearce asked Kusani to step out of the vehicle, and Trooper Fearon asked Kelleher to step out of the vehicle. After Plaintiff stepped out of the vehicle, Trooper Fearon walked over to Trooper Pearce, who was standing at the rear of Kusani’s vehicle. The two Troopers remained at the rear of Kusani’s vehicle for a couple of minutes. Then Trooper Fearon walked back to where Plaintiff was standing and placed him in handcuffs.
 

 Plaintiff testified that the handcuffs were too tight, and that he experienced pain in his arms and back when he was placed in the back of the patrol car while wearing the handcuffs. Defendant Fearon transported plaintiff to the New York State Police Barracks in Brewster, New York. At the barracks, Trooper Fearon conducted a strip search of the plaintiff in a bathroom. Complying with the Trooper’s request, Plaintiff disrobed. Trooper Fearon went through plaintiffs clothing, including his pockets. Trooper Fearon put on surgical gloves, asked Plaintiff to bend over and spread his “rectum cheeks.” Plaintiff stated that when he complied with Fearon’s request, Fearon touched him and “he kind of spread it a little further.”
 
 *357
 
 Plaintiff said that during the strip search he felt “violated,” “humiliated” and “scared.”
 

 Plaintiff testified that when the strip search was over, Fearon said, “Get dressed and get out of here.” Plaintiff was never charged with a crime.
 

 Plaintiff did not suffer from any physical trauma as a result of the strip search. He testified that he suffered from emotional injuries, including headaches and loss of sleep for an unspecified period. He further testified that for some time after the strip search he “was an emotional wreck.” A few days after the strip search, Plaintiff sought medical treatment at Putnam Hospital Center Emergency Room. He complained to the emergency room physician of a persistent headache and pain in his shoulders, upper back and neck. On cross-examination, Plaintiff admitted that he had sought medical treatment for headaches prior to the date of the strip search. Plaintiff admitted also that he never sought or received any professional treatment for his alleged emotional distress, either from a professional therapist or from a member of the clergy.
 

 Kusani’s Testimony
 

 Plaintiffs second witness was Reza Ku-sani, whose deposition was read in to the record at trial because he was unavailable. Kusani testified that, after he was pulled over, two troopers searched his car. He testified that Trooper Pearce, the first officer, began the search, and that the second officer assisted him in the search. Kusani testified that it was Fearon, the second officer at the scene, who discovered a hypodermic needle in the trunk. It was after the needle was discovered that he was placed under arrest. The car search continued and the officers turned up a pouch with narcotic substances (pills), also in the trunk. He further testified that after the items were discovered, the officers continued to search his car for about thirty minutes before he was taken to the barracks.
 

 Kusani testified that all of the medications that were in the trunk of his car were prescribed to him, with the exception of some pills he had purchased in Turkey for the treatment of diarrhea. Kusani testified that Trooper Pearce asked him about the needle and the narcotics. He testified that he told Pearce that everything in the car belonged to him and that “Mr. Kelle-her had nothing to do with whatever was inside of the vehicle.” (Tr. 128.) Kusani testified that he discussed with Pearce the nature of the pills in the pouch and that he had been using the hypodermic needle for treating a cyst in his mouth. Kusani testified that he made these statements at the scene, before he and Plaintiff were taken to the barracks.
 

 Dr. Barone’s Testimony
 

 Plaintiffs third witness, Dr. Philip Bar-one, is Plaintiffs chiropractor. He testified that Plaintiff suffered from pains in his neck and back, which the Doctor testified he had diagnosed as resulting from the handcuffing during Kelleher’s arrest Dr. Barone testified that Plaintiff did not tell him of any previous medical history with respect to the same injuries. Plaintiff testified at trial that he had been to Phelps Memorial Hospital 20 days before the arrest, and the medical records from that visit indicated that Plaintiff conveyed physical complaints to the emergency room staff, similar to those he had raised to Dr. Barone. However, none of Dr. Barone’s testimony concerned emotional trauma, nor did he testify that Plaintiff conveyed to him that he suffered the physical injuries as a result of the strip search.
 

 Rule 50 Motion
 

 After plaintiff rested, defendant moved to dismiss the action pursuant to Fed. R.Civ.P. 50 on the ground that Plaintiff had failed to make a prima facie case on either the false arrest claim or the unlawful strip search claim. The Court dismissed the false arrest claim as a matter of law, finding that Trooper Fearon had probable cause under New York law to arrest Plaintiff for unlawful possession of
 
 *358
 
 narcotics and hypodermic needles, under the so-called auto presumption of the New York Penal Law § 220.25, which provides:
 

 The presence of a controlled substance in an automobile, other than a public omnibus, is presumptive evidence of knowing possession thereof by each and every person in the automobile at the time such controlled substánce was found.
 

 Defendant’s Case
 

 The defense put on two witnesses: Trooper George Pearce and Defendant, Trooper Denzil Fearon.
 

 Pearce’s Testimony
 

 Trooper Pearce stopped a vehicle heading eastbound on Route 6 after observing the driver, Reza Kusani, commit 3 traffic infractions. Pearce asked Kusani for his driver’s license and registration, and returned to his patrol vehicle to run a check to determine the status of both the driver and the vehicle. Trooper Pearce received a transmission back from his base, Brewster Barracks, that Kusani’s license had been revoked. Trooper Pearce.thereupon radioed Brewster Barracks to send a second trooper as backup, as the car contained two occupants and Pearce expected that the vehicle might have to be impounded, searched and inventoried.
 

 Trooper Pearce then approached the driver’s side of the vehicle and asked the driver to step out of the vehicle. After further inquiry, Trooper Pearce discovered that Kusani’s license had been revoked. He arrested Kusani for Aggravated Unlicensed Operation of a Vehicle in the third degree. He conducted a patdown of Kusa-ni’s clothing, handcuffed him, and escorted him to his trooper vehicle. After Trooper Fearon arrived as back-up, Trooper Pearce conducted an inventory search of the car. He found narcotics and hypodermic needles in the trunk.
 

 When Pearce asked Kusani about the drugs and needles, Kusani professed to know nothing about them. On cross-examination, Pearce elaborated:
 

 Q. Did you ask [Kusani about the items found]?
 

 A. Yes, I did.
 

 Q. And what was his answer?
 

 A. He said he didn’t know what I was talking about.
 

 Q. So, he neither admitted it or denied it was his?
 

 A. I asked him if he had any knowledge of the needles and the pills that were found in the fanny pack, in the trunk of the vehicle, and he said, “I do not know what you’re talking about.”
 

 Q. And that was shown to him?
 

 A. Eventually, yes, it was.
 

 Q. And he still maintained, “I don’t know what you’re talking about?”
 

 A. Until we got him back to the station, yes.
 

 Q. And was he, in your mind, denying those items existed?
 

 A. Yes. (Tr. at 180-181.)
 

 Pearce told Trooper Fearon that Kusani had denied knowledge of the drugs. Pearce further testified that it was police procedure that “if neither one or any of the occupants are taking responsibility [for items found in the car], it’s presumed that they all knew about it,. and that they are jointly in possession.” (Tr. 183.)
 

 This was a matter of some importance since, according to Pearce, if Kusani had admitted at the scene that the drugs were his, Plaintiff, would have been released immediately.
 
 [1]
 
 There was a direct conflict
 
 *359
 
 between Pearce — who stated that Kusani denied responsibility for the drugs until he arrives at the Barracks — and Kusani — who claimed that he absolved Plaintiff at the scene of the stop. This difference, as will be seen, is critical.
 

 Pearce testified that, after he learned that the drugs were Kusani’s, he informed Fearon, who had Plaintiff in custody at the Barracks.
 

 Fearon’s Testimony
 

 Trooper Fearon testified that Pearce showed him the drugs and needles and said that Kusani had denied ownership of the drugs. Fearon then asked Plaintiff about the items. Plaintiff denied that the drugs and needles belonged to him. Fear-on placed Plaintiff under arrest. He then took Plaintiff to the Brewster Barracks, where he strip searched Plaintiff.
 

 Fearon testified that it was not police policy to strip search all suspects. He testified that Mr. Kelleher was strip searched because he was under arrest for criminal possession of a controlled substance and “we had to make sure that he didn’t have any further controlled substances on his person.” (Tr. 211.)
 

 Fearon denied that he touched Plaintiff during the strip search, in direct contradiction to Plaintiffs testimony. He testified that he wore surgical gloves during the entire exam, even while he searched Plaintiffs clothing. When asked why he ■wore the gloves, Fearon testified:
 

 A. The reason gloves are worn, is to keep anything that he might have at this body, blood, any sort of contaminant, so it wouldn’t get on me. Aso, I mean, if I might have a cut or contaminant on my finger, I don’t it to get on him, on his clothing. (Tr. 214.)
 

 This contradicted Mr. Kelleher’s testimony that Fearon wore the gloves only after he had searched through Kelleher’s clothes.
 

 Pearce testified that Kusani informed him that the drugs were his after they were back at the Barracks. Troopers Pearce and Fearon both testified that Pearce then informed Trooper Fearon— after he emerged from the bathroom with Mr. Kelleher — that Kusani had taken responsibility for possession of the drugs and needles and that Mr. Kelleher could be released. Plaintiffs testimony that Fear-on told him he was free to go while they were still in the bathroom contradicted Fearon’s and Pearce’s testimony.
 

 Fearon confirmed Pearce’s statement that Plaintiff never would have been arrested or searched if Kusani had taken responsibility for the drugs at the scene. Thus, on direct examination, Trooper Fearon testified as follows:
 

 Q. Trooper Fearon, had Mr. Kusani admitted at the roadside that the drugs and the needles were his, would Mr. Kelleher have been arrested for this crime?
 

 A. No. (Tr. 217.)
 

 And on cross-examination, Trooper Fearon was asked:
 

 Q. Let’s suppose someone — there are two people in the car. Contraband is found. One says “It’s mine,” and based on that statement, you accept that as being true?
 

 A. Yes.
 

 Q. Okay. (Tr. 234.)
 

 
 *360
 
 He further testified that “if Mr. Kusani had claimed ownership when he was initially asked, then
 

 Mr. Kelleher would have been able to leave.” (Tr. 297.)
 
 [2]
 

 Jury Charge
 

 Because the Court dismissed the unlawful arrest claim as a matter of law at the close of Plaintiffs case, the only claim left for the jury was whether Plaintiff was strip searched, pursuant to a lawful arrest, in violation of his constitutional right to be free from unreasonable search. The jury was instructed on the New York law governing unlawful possession of hypodermic needles and unlawful possession of controlled substances and the law concerning the circumstances under which a strip search may be conducted incident to a lawful arrest. They were further instructed on qualified immunity and proximate cause. (Tr. 327-338.)
 

 The jury returned a verdict for the Plaintiff and awarded him $125,000 in compensatory damages.
 

 Motion for Judgment as a Matter of Law
 

 Defendant moves here under Rule 50(b) for judgment as a matter of law or, in the alternative, for a new trial or remittitur. Rule 50(b) allows the Court to enter a judgment notwithstanding the jury’s verdict whenever the law so requires. “Judgment as a matter of law may' not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor.”
 
 Galdieri-Ambrosini v. National Realty & Develop. Corp,
 
 136 F.3d 276, 289, (2d Cir.1998). Thus, in deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury. The court may not itself weigh the credibility of witnesses or consider the weight of the evidence.
 
 See, id.
 
 “JMOL should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury’s findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].”
 
 Kirsch v. Fleet Street, Ltd.,
 
 148 F.3d 149, 161 (2d Cir.1998) (citing
 
 Cruz v. Local Union No. 3 of the Int’l B’hood of Electrical Workers,
 
 34 F.3d 1148, 1154 (2d Cir.1994)).
 

 Defendant is not Entitled to Qualified Immunity
 

 Since Defendant admitted strip searching Plaintiff, the only issue was whether Trooper Fearon was entitled to qualified immunity. The jury specifically found that Trooper Fearon was not entitled to quali
 
 *361
 
 fied immunity. Defendant argues here that he was entitled to qualified immunity and, as a matter of law, that the judgment against him should therefore be vacated.
 

 Where the plaintiff alleges the violation of a clearly established right — as was the case here — qualified immunity protects a police officer from civil liability lor violating a plaintiffs constitutional rights only if “ ‘a reasonable officer could have believed’ his action to be lawful, in light of clearly established law
 
 and the information he
 
 possessed.”
 
 Weyanl v. Okst,
 
 101 F.3d 845, 857 (2d Cir.1996) (quoting
 
 Hunter v. Bryant,
 
 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991)) (emphasis added). Trooper Fearon would have been entitled to qualified immunity if, at the time of the challenged action, it was objectively reasonable for him to believe that his behavior did not violate the plaintiffs clearly established rights.
 
 Lennon v. Miller,
 
 66 F.3d 416, 418 (2d Cir.1995) (citing
 
 Anderson v. Creighton,
 
 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). The test is objective; the Trooper’s subjective belief is irrelevant.
 
 See Crawford-El v. Britton,
 
 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998).
 
 See also, Simms v. Village of Albion,
 
 115 F.3d 1098, 1108 (2d Cir.1997).
 

 Plaintiff had a right to be free from unreasonable search and seizure. A strip search is permitted as a reasonable method of discovering evidence of a crime and deterring the smuggling of contraband into prison facilities.
 
 Bell v. Wolfish,
 
 441 U.S. at 588, 99 S.Ct. 1861 (1979). Detainees who are lawfully incarcerated may be required to expose their body cavities for visual inspection as a part of a strip search
 
 where an objectively reasonable suspicion exists that they are ca,Trying contraband,
 
 weapons, means of escape or evidence of a crime.
 
 Id.
 
 at 588, 99 S.Ct. 1861 (emphasis added). Whether an objectively reasonable suspicion exists arises from the nature of the charge and the circumstances of the arrest. In accordance with the guidance from the Supreme Court, the New York State Trooper manual states:
 

 Do not conduct a strip search or body cavity search without reasonable suspicion that the prisoner may be concealing weapons or contraband. Reasonable suspicion may be based on the nature of the charge, such as weapons or narcotics violations or assault, the nature and conduct of the arrestee, or the particular circumstances of the arrest.
 

 New York State Police Policy, § 31 E(2).
 

 It is well established that it is within the province of the jury to decide factual issues with respect to the defense of qualified immunity.
 
 See Kim v. Hurston,
 
 182 F.3d 113 (2d Cir.1999). The existence of reasonable suspicion justifying a strip search is a factual issue to be decided by the jury.
 
 See Swain v. Spinney,
 
 117 F.3d 1 (1st Cir.1997).
 

 The evidence presented at trial was sufficient to support the finding that Trooper Fearon had no objectively reasonable suspicion to strip search Plaintiff, even though Trooper Fearon had probable cause to arrest Plaintiff for possession of narcotics based on the automobile presumption. Kusani testified that he told Trooper Pearce that the needles and pills belonged to him at the time of the stop, before either he or Mr. Kelleher were placed in the patrol cars and taken to Brewster Barracks. Trooper Pearce testified that Kusani did not claim possession of the drugs until after he was brought back to the barracks. Ordinarily, this discrepancy would be of little moment. But in this case, it assumes critical proportions. Why? Because both troopers testified that it is standard police practice that, where one occupant of an automobile claims ownership of drugs found in a common area of the car, all other persons found in the car who deny ownership of the drugs are free to leave immediately, New York’s car presumption notwithstanding. This testimony may seem incredible to anyone with experience in law enforcement, but that does not include the jurors. And if the jurors
 
 *362
 
 chose to believe Kusani’s account of then-conversation over Pearce’s, they could infer that Plaintiff should have been allowed to leave the scene without even going to the Barracks — and without being strip searched.
 

 If Fearon and Pearce had never spoken at the scene, there would have been no evidence from which the jury could have inferred that Fearon knew that Kusani had claimed responsibility for the drugs. If they had not spoken, Fearon would have been entitled to qualified immunity as a matter of law on the basis that Kelleher was under arrest for possession or narcotics, a charge under which New York State Police Policy authorizes strip searches. However, the jury had a basis for inferring that Fearon knew what Pearce knew and conducted the strip search anyway. The evidence showed that the two officers met and spoke at the rear of Kusani’s car after Pearce confronted Kusani with the items from the trunk and after Kusani confessed to owning the drugs (relying on the version the jury must have believed). The troopers testified that this was when Pearce told Fearon that the drugs were not his, but since the jury necessarily adopted Kusani’s version of the Pearee/Kusani conversation, they must have rejected this testimony. Following the Troopers’ conversation, Defendant took Kelleher to the Barracks and strip searched him. Viewing the evidence most favorably to the Plaintiff, immediately after the search, Fearon told Kelleher to get dressed and go, without ever having another conversation with Pearce. Since it was not necessary for Kelleher to have drugs on his persons for Pearce to hold plaintiff for criminal possession of a controlled substance, the only logical, inference is that Fearon was told, before the strip search, that Kusani had already confessed to owning the drugs and had therefore (in the troopers’ interpretation of the- law) overcome the automobile presumption. Otherwise, he would have no basis to “unarrest” Kelleher (Trooper Pearce’s evocative word) immediately upon the conclusion of the. strip search.
 

 Defendant argues that, even if the jury believed Kusani’s testimony that he admitted ownership of the drugs and needles, Trooper Fearon’s decision to conduct a strip search of the Plaintiff was still objectively reasonable as a matter of law. Defendant’s argument rests on the fact that Plaintiff was found in a vehicle in which controlled substance and hypodermic needles were discovered. The contraband was found in the trunk of the car, not in the personal possession of either the Plaintiff or the driver of the car. Defendant contends that these facts, together with the automobile presumption, give rise to an objectively reasonable suspicion that Plaintiff carried contraband, and thus justified the strip search. Further, Defendant notes that even if Trooper Fearon subjectively believed that Plaintiff was not carrying contraband, the strip search would be justified.
 

 Defendant is correct that the test for an objectively reasonable suspicion looks to what a reasonably objective officer would do under the same circumstances. However, it is for this very reason that the jury’s findings of fact on the question of immunity must be upheld is this case. The only evidence before the jury of what a reasonably objective officer would have done in the circumstances of this case was the Troopers’ testimony that, given the facts posited by the Plaintiffs witnesses, Kelleher should never even have been taken back to the barracks, let alone strip searched. This removes any rationale for conducting a strip search.
 

 I therefore find as a matter of law that Defendant was not entitled to qualified immunity.
 

 Motion for New Trial or Remittitur
 

 Defendant argues that, even if he was not entitled to qualified immunity, the jury award was excessive, and he moves for a new trial or remittitur of the jury award. A district court may grant a
 
 *363
 
 new trial if the jury has reached a seriously erroneous result or if the jury’s verdict is a miscarriage of justice.
 
 See Sorlucco v. New York City Police Dep’t,
 
 971 F.2d 864, 875 (2d Cir.1992). For the purposes of determining whether a new trial is appropriate, the court may weigh the evidence on its own, and need not view it in a light most favorable to the non-movant.
 
 See Song v. Ives Laboratories Inc.,
 
 957 F.2d 1041, 1047 (2d Cir.1992). A new trial may be ordered even where there is substantial evidence to support the jury’s verdict,
 
 see id.,
 
 and a new trial may be ordered on all or only some of the issues at the first trial.
 

 Remittitur is the “process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.”
 
 Earl v. Bouchard Transp. Co.,
 
 917 F.2d 1320, 1328 (2d Cir.1990). Remittitur is proper where “the award is so high as to shock the judicial conscience and constitute a denial of justice.”
 
 Ismail v. Cohan,
 
 899 F.2d 183, 186 (2d Cir.1990). The doctrine of remittitur recognizes that, although it is within the jury’s discretion to compute damages, there is an upper limit, and whether that has been surpassed is a question of law, not fact.
 
 Mazyck v. Long Island R. Co.,
 
 896 F.Supp. 1330, 1336 (E.D.N.Y.1995) (citing
 
 Dagnello v. Long Island R.R. Co.,
 
 289 F.2d 797, 806 (2d Cir.1961)). A jury “may not abandon analysis for sympathy for a suffering plaintiff and treat and injury as though it were a winning lottery ticket.”
 
 Scala v. Moore McCormack Lines, Inc.,
 
 985 F.2d 680, 684 (2d Cir.1993). Here, even if the jury found that Plaintiffs rights had been violated as a result of the strip search, a new trial or remittitur might be appropriate if this Court deems the damages award excessive.
 

 The jury here made an award to Plaintiff in the amount of $125,000 for compensatory damages for his emotional distress. At no point in the trial did Plaintiff produce any evidence of medical treatment or other professional expenses related to his claim of emotional distress. In fact, the only evidence of medical treatment was the testimony of his chiropractor, which was limited to the physical injuries Plaintiff alleged he sustained as a result of the handcuffing — not the result of the strip search. At no point did Plaintiff put on any evidence — save his own testimony — to corroborate his concluding statement that the headaches, sleeplessness and the general emotional distress he claimed to have suffered resulted from the strip search.
 

 In
 
 Annis v. County of Westchester,
 
 136 F.3d 239 (2d Cir.1998), the Second Circuit described the evidence necessary to establish damages for emotional distress, and held that where a plaintiff does not allege any physical manifestations of an emotional injury, fails to introduce evidence to corroborate a claim that he needs or has had counseling, and does not suffer and job detriment, compensatory damages are inappropriate.
 
 Id.
 
 at 239. In
 
 Annis,
 
 a female former police officer sued under Section 1983 alleging sex discrimination during her employment with the Mount Vernon and Westchester county police departments. The jury awarded Anis $541,001 in compensatory and punitive damages. The district court denied defendant’s motion for judgment as a matter of law, but granted defendant’s the motion for remittitur or a new trial, reducing the damage award to $225,001. The Second Circuit vacated and remanded the entire award on the basis that the jury had no grounds,
 
 inter alia,
 
 that the plaintiff presented no evidence — apart from her own testimony — to support her claim of emotional distress.
 

 The facts here are similar to those in
 
 Annis.
 
 Mr. Kelleher has alleged, but has provided no proof — beyond his own testimony' — to support his claim for damages. Notwithstanding the Defendant’s liability, Mr. Kelleher has simply failed to prove an injury.
 

 This does not mean that I must throw out the damage award altogether.
 
 *364
 
 In determining whether a jury award is excessive a court may consider jury awards in similar cases.
 
 See Martell v. Boardwalk Enterprises, Inc.,
 
 748 F.2d 740, 752-53 (2d Cir.1984). Defendant argues that the verdict of $125,000 is excessive and wholly inconsistent with the compensatory damages awarded in similar cases involving strip searches.
 
 See, e.g., Kennedy v. Los Angeles Police Department,
 
 901 F.2d 702 (9th Cir.1989) (awarding $5,000 against each of the offending officers);
 
 Abshire v. Walls,
 
 830 F.2d 1277 (4th Cir.1987) (awarding $500 and $1,000 in compensatory damages against each defendant involved in strip search);
 
 Joan W. v. City of Chicago,
 
 771 F.2d 1020 (7th Cir.1985) (ordering remittitur from $112,000 to $75,000 where plaintiff suffered emotional distress plus aggravating circumstances such as the officers threatening plaintiff, using vulgar language, and laughing at her; noting that jury awards in 8 other unlawful strip search cases in the Northern District of Illinois ranged from $3,300 to $60,000).
 

 The award of $125,000 is clearly excessive given the lack of corroborating medical testimony concerning Plaintiffs emotional distress. However, an unlawful strip search, in and of itself, is an egregious violation of Plaintiffs constitutional right to be free from unwarranted government intrusion of his person. Moreover, Plaintiff testified that he was touched during the search by Trooper Fearon, which is contrary to State Police policy for conducting a strip search. I therefore cannot find that Plaintiff is entitled to no damages.
 

 In light of the above, I order remittitur in the amount of $25,000. If Plaintiff is unwilling to accept that amount, I will schedule a new trial oh the question of damages.
 

 This constitutes the decision and order of this court.
 

 [1]
 

 . Pearce testified:
 

 Q. Okay. Now, when he was arrested, he was arrested for possession of these items, the plaintiff here?
 

 A. Yes.
 

 Q. And your statement was, once someone takes a position that it is theirs, you leave the other ones alone?
 

 A. Yes. They are unarrested. They are released, the charges.
 

 
 *359
 
 Q. What about at the scene? Let’s say the same situation, Mr. Kusani says “They're mine.” Would you at that time let him go, [Mr. Kelleher] go home?
 

 A. Yes. [objection made after answer and overruled]
 

 Q. Okay. So the question now is whether Mr. Kusani said, "They're mine,” at the scene, is that correct?
 

 A. Yes.
 

 Q. So if he said it, then the plaintiff would be allowed to go home?
 

 A. Yes.
 

 Q. So it is your position he never said, "It was mine”; is that, correct?
 

 A. Not at the scene, no. (Tr. 184-185.)
 

 [2]
 

 . Fearon testified:
 

 Q. Did you hear [Trooper Pearce] state that the purpose of determining ownership was to find out who the owner was and so that the other person would be allowed to leave?
 

 A. When conducting an investigation, we have to determine who owns the items. If in — if in the case which happened in this case, if neither person claims ownership, then under the law both subjects are presumed to possess the items, in this case, the drugs.
 

 Q. Related to this case — if Mr. Kusani claimed ownership, would Mr. Keller be allowed to go home or leave?
 

 A. That depends on what time Mr. Kusani claimed ownership.
 

 Q. Why is the time important?
 

 A. It's very important.
 
 If Mr. Kusani had claimed ownership when he was initially asked, then Mr. Kelleher would have been able to leave.
 

 Q. So, if Mr. Kusani at the scene said, "I'm the owner,” then there would be no need for a strip search; would that be correct?
 

 A. Which he didn’t.
 

 COURT: Just answer the question that you are asked trooper.
 

 Q. Please, please. All I’m asking you, if at the scene Mr. Kusani stated, "I am the owner,” then, a that point, Mr. Kelleher would be allowed to go home?
 

 A. Yes. (Tr. 297.) (emphasis added)