**Kevin HILL, Breck Harrison, Mark McCord, Duval Tyson and Damian Alvarez, Plaintiffs,**

v.

**AIRBORNE FREIGHT CORPORATION, Defendant.**

Nos. 97–CV–7098 (FB), 98–CV–6249 (FB).

United States District Court, E.D. New York.

July 17, 2002.

Michael G. O'Neil, New York, NY, for Plaintiffs.

David Kreitzman, Donald M. Spector, Seth H. Borden, Kreitzman, Mortensen, Simon & Irgang, New York, NY, for Defendant.

### MEMORANDUM & ORDER

BLOCK, District Judge.

Plaintiffs, Kevin Hill ("Hill"), Breck Harrison ("Harrison"), Mark McCord ("McCord"), Duval Tyson ("Tyson") and Damian Alvarez ("Alvarez") (collectively "plaintiffs"), who are each African–American, brought this action alleging that Airborne Freight Corporation ("Airborne") discriminated against them on the basis of their race by subjecting them to more severe discipline than similarly situated white employees. In addition, Hill asserted a retaliation claim against Airborne.[1] The case was tried before a jury, which

---

1. The discrimination claims were brought pursuant to 42 U.S.C. § 1981, New York State Executive Law § 296 *et seq.* ("New York State Human Rights Law"), and the New York City Administrative Code § 8–107 ("New York City Human Rights Law"). The retalia-

returned a verdict in favor of plaintiffs on all their claims.

On the discrimination claims, the jury awarded the following compensatory damages: Hill—$200,000, Harrison—$125,000, McCord—$80,000, Tyson—$125,000, Alvarez—$150,000. Hill was awarded $100,000 in compensatory damages on his retaliation claim. The jury also awarded each plaintiff $300,000 in punitive damages on his discrimination claim, and awarded Hill $300,000 in punitive damages on his retaliation claim.

Airborne is a major private mail service. Plaintiffs were all delivery drivers who were employed at the Airborne Brooklyn Station. Regarding the discrimination claims, plaintiffs asserted that Airborne began to engage in discriminatory discipline against them after Airborne installed a new Station Manager, Richard Scarola ("Scarola")—a Caucasian—to manage the Brooklyn Station. In regard to the retaliation claim, Hill asserted that Airborne retaliated against him for filing an Equal Employment Opportunity Commission ("EEOC") complaint, and for writing a letter to the president of Airborne protesting the "harassment and discrimination" he and other employees had been subjected to by Scarola. Ex.[2] 4 (letter to Airborne president); *see* Ex. 3 (EEOC Complaint).[3]

Pending before the Court are various post-verdict motions pursuant to Fed. R.Civ.P. 50(b) ("Rule 50(b)") and Fed. R.Civ.P. 59 ("Rule 59"). In respect to liability, Airborne moves for judgment as a matter of law pursuant to Rule 50(b) or, alternatively, for a new trial pursuant to Rule 59. Regarding damages, Airborne moves for judgment as a matter of law pursuant to Rule 50(b) or, alternatively, for a new trial or remittitur pursuant to Rule 59. As to liability, Airborne's Rule 50(b) motion is granted with respect to McCord and denied as to all other plaintiffs. In regard to the prevailing plaintiffs, Airborne's Rule 50(b) motion on damages is denied; Airborne's Rule 59 motion seeking a new trial on damages is denied on condition that the prevailing plaintiffs accept remittiturs to their compensatory and punitive damage awards in the various sums set forth below.

## I. RULE 50(b) & 59 STANDARDS

■ Action taken by a court under Rule 50 "is a performance of the court's duty to assure enforcement of the controlling law and is not an intrusion on any responsibility for factual determinations conferred on the jury." Fed.R.Civ.P. 50 Advisory Committee Note (1991). The same standard applies to a Rule 50(b) renewed motion for judgment as a matter of law and a Rule 50(a) motion for judgment as a matter of law. *See Raspente v. National R.R. Passenger Corp.*, 111 F.3d 239, 241 n. 3 (2d Cir.1997). Rule 50(a) authorizes the court "to enter judgment as a matter of law at any time during the trial, as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case." *Id.* Regarding the sufficiency of the evidence, a motion under either section may be granted only if "the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to

---

tion claim was brought pursuant to the same authority and to Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U.S.C. § 2000e et seq. (1994 ed. and Supp.V).

2. "Ex." refer to trial exhibits. Numbered exhibits are plaintiffs'; letter exhibits are defendant's.

3. Plaintiffs also contended that Airborne further discriminated against them by assigning them less favorable routes than white drivers; however, during the course of the trial they withdrew this claim. *See* Trial Transcript ("Tr.") at 1016–19, 1028.

find in her favor." *Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 289 (2d Cir.1998); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Vermont Plastics, Inc. v. Brine, Inc.*, 79 F.3d 272, 277 (2d Cir.1996). This means that "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture, or ... the evidence is so overwhelming that reasonable and fair-minded persons could only have reached the opposite result." *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53–54 (2d Cir.1993) (citation and internal quotation marks omitted). "[T]he court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence." *Galdieri–Ambrosini*, 136 F.3d at 289 (citations omitted). While the Court must "review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 150–51, 120 S.Ct. 2097; *see Tolbert v. Queens College*, 242 F.3d 58, 70 (2d Cir.2001) (reversing district court's decision granting Rule 50 motion because the district court "did not view the evidence as a whole, or take it in the light most favorable to [the nonmovant], or disregard evidence favorable to the defense that the jury was not required to believe.").

■ Unlike a motion for judgment as a matter of law under Rule 50(b), in considering a motion for a new trial under Rule 59 "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *DLC Management Corp. v. Town of Hyde Park*, 163 F.3d 124 (2d Cir.1998). However, since a jury's verdict

should "rarely be disturbed," a new trial will only be granted if the court determines that the verdict was " 'seriously erroneous' or a 'miscarriage of justice[.]' " *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir.2002) (internal quotation marks omitted). Excessive monetary awards come under the umbrella of Rule 59. " 'If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount.' " *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996) (quoting *Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.1995)).

## II. LIABILITY

### A. Intentional Discrimination Claims

The Court charged the jury, without objection, under the theory of disparate treatment. As the Supreme Court long ago explained: " 'Disparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

■ Echoing plaintiffs' claims, the Court told the jury that "[e]ach of the five plaintiffs contend that Airborne Express intentionally discriminated against him by subjecting him to harsher discipline than [his] white co-workers because of his race," and instructed the jury to "evaluate each of the plaintiff's claims individually." Jury Charge at 6.[4] Regarding the issue of dis-

---

4. The Court notes that plaintiffs did not present a pattern-or-practice claim. "To succeed

similar discipline, the Court explained that the jury "should consider whether the white co-workers were similarly situated in all material respects to the plaintiff," meaning that "[t]heir circumstances need not be identical, but there should be a reasonably close resemblance of facts and circumstances." *Id.* at 6; *see also Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001). Regarding the requisite intent to discriminate, the Court charged that "the plaintiff you are considering must prove that racial discrimination was a 'motivating factor' behind the disciplinary action," meaning that the plaintiff "must demonstrate that it is more likely than not that the disciplinary decision was made in substantial part because of the plaintiff's race." Jury Charge at 6; *see Reeves,* 530 U.S. at 153, 120 S.Ct. 2097; *Grillo v. New York City Transit Authority,* 291 F.3d 231, 234 (2d Cir.2002); *Parker v. Sony Pictures Entertainment, Inc.,* 260 F.3d 100, 108 (2d Cir.2001); *Raskin v. Wyatt Co.,* 125 F.3d 55, 60–61 (2d Cir.1997); *see also Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d Cir.2000) ("Our consideration of claims brought under the state and city human rights laws parallels the analysis used in Title VII claims.").

### 1. Hill, Harrison, Tyson and Alvarez

The terms and conditions of plaintiffs' employment were governed by the provisions of a collective bargaining agreement. The agreement set forth a discipline structure dividing offenses into four categories, A, B, C and D, and prescribing maximum punishments applicable to each. *See* Ex. 44 ("Collective Bargaining Agreement"). Category A violations, for which "summary discharge" could be imposed, were the

most serious; category D violations were the least.

It was common practice at the Brooklyn Station to terminate an employee who engaged in a serious disciplinary violation and then reduce the termination to a suspension. The Court uses the term "fully terminated" to refer to instances where Airborne refused to reduce a termination to a suspension and the employee was compelled to proceed to arbitration to seek reinstatement-a right provided by the collective bargaining agreement. Between 1996 and 1998, plaintiffs Hill, Harrison, Tyson and Alvarez were all fully terminated for allegedly engaging in actions proscribed by the disciplinary scheme of the collective bargaining agreement.

Hill was fully terminated twice. First, in 1996, he was fully terminated for "theft of company services." Ex. 2. The charge, a category A offense, arose from an incident where Airborne alleged that Hill attempted to send a car door via Airborne Express without paying the appropriate fee. Hill was reinstated after successfully invoking arbitration. *See* Tr. at 229. In 1998, Hill was again fully terminated when he accrued his third category B violation. *See* Ex. 26, 44. The third violation arose from an incident where Hill admitted he had lost a walkie-talkie. *See* Tr. at 273. Hill again challenged the full termination; however, this time Airborne prevailed before the arbitrator. *See* Tr. at 347, 273.

Harrison was fully terminated in 1996 for "theft," a category A violation. *See* Tr. at 347, 413; Ex. H. He unsuccessfully invoked arbitration-marking the end of his employment at Airborne. *See* Tr. at 347, 419.

on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.' " *Robinson v. Metro–North Commuter R.R. Co.,* 267 F.3d 147, 158 (2d Cir.2001) (quoting *Int'l Bhd. of Teamsters,* 431 U.S. at 336, 97 S.Ct. 1843).

Tyson's full termination resulted from accruing three category B violations. The first was for his involvement in a minor car accident while making deliveries in June 1998. *See* Tr. at 156–57. The second resulted from an accusation of theft in August 1998. The final category B violation was issued for insubordination. *See* Tr. at 158–59. Tyson also unsuccessfully sought reinstatement through the arbitration process. *See* Tr. at 884, 979, 980.

Alvarez was fully terminated in 1997 for a category A violation relating to an accusation of theft; however, he successfully challenged the full termination and was reinstated by the arbitrator seven months later. *See* Tr. at 90, 97–98, 116, 347, 978–79.

During the period in which Hill, Harrison, Tyson and Alvarez were each fully terminated—1996 through 1998—not one white driver from the Brooklyn Station was fully terminated. Tr. at 347–48. During that period, there were at least five white employees who were disciplined for category A violations, and thus subject to full termination; however, none of the white employees were fully terminated— meaning, in each instance the white employee was either not terminated or the termination was later reduced to a suspension without the need to resort to arbitration. *See, e.g.*, Tr. at 347–48, 982–85, 990; Ex. 5, 30, 46, 47, 49, 50, 55, AAA. There was, however, one white employee who was fully terminated for a category A offense in 1999. *See* Tr. at 985.

■ The jury could have reasonably determined that the white drivers from the Brooklyn Station who were charged with category A violations between 1996 and 1998, but were not fully terminated, were sufficiently similar to plaintiffs Hill, Harri-

son and Alvarez, who were each fully terminated for category A offenses. That employees of Airborne who engaged in violations of the same degree were similarly situated is supported by the fact that Airborne itself agreed to create the four hierarchical degrees for discipline violations and to prescribe the same range of punishment for the offenses within each degree. As for Tyson, his claim is even more compelling since he was fully terminated for accruing only category B violations; hence, he was treated more harshly than the five white employees who engaged in more serious violations.

■ These multiple incidents of disparate treatment were of sufficient evidentiary magnitude to support the jury's determination that the differential treatment meted out against these four plaintiffs by Airborne's management was the product of intentional racial discrimination. In addition, there was significant evidence of abject racial animus that the jury was entitled to add to the evidentiary mix. This evidence consisted of numerous instances where managers made disparaging remarks about African Americans, and evidence that Airborne assigned delivery routes to drivers on the basis of their race.[5] *See* Tr. at 79, 101, 110, 113–14, 321–22, 404; Ex. 68. As for the disparaging remarks, they consisted, by way of example, of a manager telling an African–American employee who was singing a gospel song that he "didn't want to hear none of those slave songs," another manager stating that he didn't like the fact that a "fucking black guy" was in a white neighborhood because he didn't believe in "mixing" between the races, and Scarola referring to McCord as "boy." Tr. at 113, 321–

---

**5.** While plaintiffs withdrew their claim of intentional discrimination in route assignments, the Court, nonetheless, permitted plaintiffs to "talk about route assignments in the general framework ... to suggest that this is some indicia that there was discrimination." Tr. at 1016.

22; *see Abdu–Brisson v. Delta Air Lines,* 239 F.3d 456, 468 (2d Cir.2001) ("While . . . stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination . . . when 'other indicia of discrimination are properly presented, the remarks can no longer be deemed "stray," and the jury has a right to consider that they bear a more ominous significance.' ").

Airborne argues that since one white driver was fully terminated in 1999, plaintiffs cannot prove disparate treatment; however, the jury was free to view that termination with skepticism since it was only after the lawsuit was filed and discovery was commenced that the termination occurred. *See* Tr. at 171–73, 305, 444, 633–34, 705–06; *see also Chuang v. University of California Davis, Bd. of Trustees,* 225 F.3d 1115 (9th Cir.2000) ("[N]on-discriminatory employer actions occurring subsequent to the filing of a discrimination complaint will rarely even be relevant as circumstantial evidence in favor of the employer[.]" (internal quotation marks omitted)); *Gonzales v. Police Dept., City of San Jose, Cal.,* 901 F.2d 758 (9th Cir.1990) (holding that actions taken to remediate discrimination "just before trial" or "in response to [a] lawsuit . . . are equivocal in purpose, motive and permanence.")

■ In sum, there is ample evidence to sustain the jury's finding of liability on Hill, Harrison, Tyson and Alvarez's discrimination claims in the face of Airborne's Rule 50(b) motion. As for Airborne's Rule 59 motion, the jury's verdict was not "seriously erroneous" or a "miscarriage of justice[;]" thus, Airborne's motion for a new liability trial as to these plaintiffs is also denied. *Farrior,* 277 F.3d at 635.

### 2. *McCord*

■ Unlike his fellow plaintiffs, McCord was not disciplined more harshly than similarly situated white employees. McCord was hired in June 1997 as a driv-er. *See* Tr. at 690. On November 4, 1997, McCord, accompanied by his shop steward, was summoned to talk to Scarola and was informed that he was being "brought up for termination . . . or possibly suspension" because he was late with a delivery, and the lateness was his fifth category D violation. Tr. at 698; *see* Ex. 39 M. McCord then informed Scarola that he was feeling ill and wished to take a sick day. This request was denied, but McCord's shop steward informed him that he was within his rights to take the sick day. Scarola then told McCord, "get out there, boy, and get that truck out there." Tr. at 700. McCord informed Scarola that he was offended by the use of the word "boy," and McCord went to the time clock to punch out. Scarola told McCord four more times that he was not permitted to leave. McCord punched out and left. McCord was issued four category B violations for insubordination, one for each time Scarola ordered him not to leave. *See* Ex. 39 N, 39–O, 39–P, 39–Q. The issue of McCord's fifth category D violation was never resolved, and he was not disciplined for that offense. McCord was officially "terminated for insubordination" on November 4, 1997, pursuant to the fourth category B violation. *See* Ex. 39–Q. McCord was later informed that Airborne had agreed to mitigate his termination to a three day suspension; however, McCord never returned to work. *See* Tr. at 725–727. There are numerous instances over the relevant time period where similarly situated white employees were terminated and Airborne reduced their terminations to short suspensions. *See* Tr. at 347–48, 355–60, 360–61, 366–68.

■ In the face of the fact that McCord was not treated differently than his white counterparts, the evidence of racial animus, though reprehensible, was insufficient to support McCord's claim; oth-

erwise, all African Americans disciplined by Airborne would have viable disparate treatment claims even if they were treated the same as, or even better than, similarly situated white employees.[6] This is in sharp contrast to the other plaintiffs, where the evidence of racial animus could properly be considered in conjunction with the differential treatment to support the conclusion that the disparate treatment was race motivated.[7]

## B. Hill's Retaliation Claim

In regard to Hill's retaliation claim, the jury was charged, without objection, as follows:

It is unlawful for an employer to subject an employee to disciplinary action because that employee engaged in certain activities which are protected by anti-discrimination laws. In order to prove his claim of retaliation, Mr. Hill must prove by a preponderance of evidence that retaliation for his participation in a protected activity was a motivating factor in a disciplinary action taken against him by Airborne Express.

A "protected activity" is the opposition to a discriminatory, or perceived discriminatory, employment practice. The challenges to the employer's practices may be formal or informal. The law permits an employee to bring charges of discrimination without fear that the employee will be subject to retaliation by the employer, provided that the employee's charges are brought in good faith. This is so even if it is ultimately determined that the employer has not discriminated against the employee.

In this case, Mr. Hill filed a charge of discrimination with the Equal Employment Opportunity Commission in 1996, he presented a petition signed by numerous drivers to the Airborne Express management, he mailed letters to Airborne Express, and he filed and maintained this lawsuit while still employed by Airborne Express. I instruct you as a matter of law, that these were protected activities, so you need not deliberate on this issue.

You must then decide whether there was a causal connection between Mr. Hill's protected activities and any disciplinary action taken against him by Airborne Express. A causal connection means that Mr. Hill's protected activity was a "motivating factor" in the imposition of the disciplinary action. Similar to my instruction on intentional discrimination, Mr. Hill is not required to prove that his protected activity was the sole, or even primary, motivation for Airborne Express to impose the disciplinary action. If you find any of Mr. Hill's protected activities were more likely than not a motivating factor in a disciplinary action, then, as I have previously instructed you, it is Airborne Express' burden to prove by a preponderance of the evidence that it would have taken the same action even if Mr. Hill had not engaged in the protected activity. If so, Airborne Express is not liable to Mr. Hill on his retaliation claim.

---

**6.** Notably, in respect to the route assignments, McCord was not one of the African-American drivers assigned to a predominantly African American delivery route, *see* Tr. at 692; Ex. 68; therefore, even if the route assignment claims had not been withdrawn, McCord could not have prevailed on such a claim.

**7.** A racially hostile workplace can, of course, be the basis for a hostile work environment claim; however, no such claim has been raised in this litigation. *See Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir.2001). The Court expresses no opinion as to whether such a claim would have been successful.

Jury Charge at 8; *see Raniola v. Bratton,* 243 F.3d 610, 624–25 (2d Cir.2001); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 185 (2d Cir.1992); *see also Cruz,* 202 F.3d at 565 n. 1; *Scott v. Bell Atlantic Mobile,* 2002 WL 550969, at * 3 n. 2 (S.D.N.Y. April 11, 2002) ("The same standard for evaluating retaliation claims is applied under the NYSHRL and the NYCHRL.").

Hill provided abundant evidence from which the jury could reasonably have concluded that retaliation was a motivating factor in the disciplinary actions taken against him. After Hill's first full termination, but before his reinstatement, he filed his EEOC complaint against Airborne alleging racial discrimination. *See* Ex 3. When Scarola was made aware of this, he told the union shop steward that he "didn't give a fuck." Tr. at 354. On February 27, 1997, shortly after Hill's reinstatement, Hill composed a letter to the president of Airborne, which was signed "Brooklyn Station Drivers." Ex. 4. Attached to the letter were the signatures of fifty-two drivers from the Brooklyn Station; Hill's signature was the first. *See* Tr. at 231–32; Ex. 4. The letter focused on the drivers' complaints of Scarola's conduct. *See* Ex. 4. The letter was also sent directly to Scarola. *See* Tr. at 233. The drivers never received a response from Airborne, *see* Tr. at 232–33, but Steve Eller ("Eller"), Airborne's Regional Field Services Manager, wrote to a union official: "One thing is very clear. Leniency hasn't worked. We are going to give them what they want. A termination will not be mitigated down if the case is strong has merit and is factually strong." Ex. 5. The letter was also sent to Scarola and Airborne's District Field Service Manager.

When Hill returned to work in early 1997, after being reinstated by the arbitrator, he was treated with "hostility" by Airborne, and management started "com[ing] down on [him] harder." Tr. at 234. In addition to his full termination in 1998, Hill also received a number of minor disciplinary actions for conduct which did not result in discipline for other drivers and which Hill had engaged in without incident prior to the EEOC complaint and the letter to the president. The actions by Hill that gave rise to these disciplinary incidents included many instances of benign and even benevolent conduct that Airborne, nonetheless, considered technical violations of company policy. For example: (1) Hill having a fellow driver watch his freight while he tried to locate some missing delivery information, *see* Tr. at 234, 252–53, Ex. 19; (2) Hill performing a required security scan of his freight two or three times, instead of once, to insure that he did not miss a piece, *see* Tr. at 235, Ex. 11; (3) Hill assisting a colleague with deliveries, *see* Tr. at 239; Ex. 13; (4) Hill using his cell phone in the station, *see* Tr. at 240, Ex. 14; and (5) Hill stopping for food on route, a daily occurrence which, prior to the EEOC complaint, Hill had engaged in together with the same supervisor who issued the discipline, *see* Tr. at 241–42, Ex. 15, *see also* Tr. at 161.

In addition, Hill testified that he was repeatedly disciplined based on false allegations. For example, he was disciplined for using profanity on the Airborne radio system. *See* Tr. at 248; Ex. 20; *see also* Tr. at 160–61. The discipline was later rescinded when two other drivers admitted that it was their voices that were mistaken for Hill's; however, despite their admissions, these drivers were never disciplined. *See* Tr. at 241–42. Hill was charged with a category A offense for threatening a supervisor; however, he testified that he was singing the lyrics to a song and was not talking to the supervisor. *See* Tr. at 246; Ex. 17. Hill was suspended without pay and was issued a four-day suspension for "failure to protect load," a category A of-

fense, for an incident involving a missing C.O.D. package. *See* Tr. at 271–72; Ex. 23, 24. Hill testified that he later learned from a colleague that the C.O.D. package had eventually been found and delivered. *See* Tr. at 271–72. Airborne management never notified Hill of these developments, even when the issue of the missing C.O.D. package came up in later disciplinary proceedings. *See* Tr. at 272–74.

Since there was sufficient evidence for the jury to determine that retaliation was a motivating factor in the disciplinary actions taken against Hill, defendant's Rule 50(b) motion regarding Hill's retaliation claim is denied; furthermore, since the verdict was not "seriously erroneous" or a "miscarriage of justice," defendant's Rule 59 motion for a new trial on the retaliation claim is also denied. *Farrior*, 277 F.3d at 635 (internal quotation marks omitted).

## III. DAMAGES

### A. Compensatory Damages

#### 1. Legal Standards

Regarding compensatory damages, the Court charged the jury that "[a]ny award of such damages must be supported by evidence, though not necessarily medical evidence, of concrete emotional or mental distress as the result of a defendant's actions, meaning that the plaintiff experienced physical manifestations." Jury Charge at 9. In so charging, the Court was guided by the Second Circuit's decision in *Annis v. County of Westchester*, 136 F.3d 239 (2d Cir.1998), rejecting a compensatory damage award in a federal discrimination case because it was supported "only ... [by Annis'] testimony" and she had "not alleged any physical manifestations of her emotional distress[.]" *Id.* at 249. Relying on *Annis*, Airborne claims that plaintiffs cannot recover compensatory damages because their testimony was supported only by general statements, rather than testimony of physical

manifestations, of their emotional and mental distress.

Although, in deference to *Annis*, the Court injected in its charge the need for testimony, albeit only by plaintiffs, of some physical manifestation of their emotional injuries, the Court need not reflect upon whether it properly culled from *Annis* the appropriate compensatory damage charge in a federal discrimination case since plaintiffs have also predicated liability under the New York State Human Rights Law and the New York City Human Rights Law.

Where, as in the present case, a federal jury considering both a federal and state cause of action has rendered a single damage award, permissible under both federal and state law, "the preferable rule ... is that the successful plaintiff be paid under the theory of liability that provides the most complete recovery." *Magee v. United States*, 976 F.2d 821, 822 (2d Cir.1992). It appears under the New York State Human Rights Law that although any physical manifestation of emotional and mental distress is a factor to consider on the issue of excessiveness, it is not the *sine qua non* of entitlement to compensatory damages. *See New York City Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207, 218, 573 N.Y.S.2d 49, 577 N.E.2d 40 (1991) (articulating criteria when reviewing compensatory damage awards for "excessiveness" under State Human Rights Law as "the duration of a complainant's condition, its severity or consequences, any physical manifestations, and any medical treatment"). Rather, a "complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct," is sufficient; however, "[b]eyond the fact of mental anguish caused by discriminatory conduct, there must be some evidence of the magnitude of the injury, to assure that the ... damage

award is neither punitive nor arbitrary." *Id.* at 216, 573 N.Y.S.2d 49, 577 N.E.2d 40; *see also Katt v. City of New York*, 151 F.Supp.2d 313, 328 n. 10 (S.D.N.Y.2001) (holding that compensatory damages under City Human Rights Law are subject to the same standard as awards under State Human Rights Law). This standard is in keeping with the rationale articulated in *New York City Transit Authority* that "due to the strong anti-discrimination policy spelled out by the Legislature of this State ... aggrieved individual[s] need not produce the quantum and quality of evidence to prove compensatory damages [they] would have had to produce under an analogous provision, and this is particularly so where, as here, the discriminatory act is intentionally committed." 78 N.Y.2d at 216, 573 N.Y.S.2d 49, 577 N.E.2d 40. Therefore, to the extent that there is a requirement under federal law that plaintiffs demonstrate some physical manifestation of their emotional suffering, New York seemingly imposes a less stringent standard. Although some of the plaintiffs have not testified that they experienced physical manifestations, each of the plaintiffs are entitled to have their compensatory damage awards evaluated under the apparently less restrictive State standard.

In keeping with the notion that a successful plaintiff is entitled to the most favorable theory of recovery, the court should apply the federal "excessiveness" standard, which is slightly more deferential than the state standard. *See Consorti v. Armstrong World Indus.*, 72 F.3d 1003, 1011 (2d Cir.1995), *vacated on other grounds*, 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 (1996) ("[T]he New York rule ... is less deferential to the jury's verdict [than the federal rule]."); *Katt*, 151 F.Supp.2d at 369 n. 45 (applying the more deferential federal standard in reviewing a damage award for emotional distress made pursuant both federal and state causes of action); *see generally Magee*, 976 F.2d at

822 (applying rule that "provides the most complete recovery"). Under the federal standard, an award will be set aside as excessive when it "shock[s] the judicial conscience and constitute[s] a denial of justice." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 165 (2d Cir.1998). Under the State standard, the award will be set aside if it "materially deviates from what would be reasonable compensation." N.Y. Civ. Prac. Law & Rules § 5501(c). The standards are similar in that they both require the reviewing court to evaluate the magnitude of the jury award by comparing it to analogous cases. *See Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 425, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). In making this assessment, the "task is not to balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater. Rather, [the court] inquire[s] whether the ... verdict is within a reasonable range." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir.1990). Notwithstanding the conceptual differences between the two standards, the Court's comparative analysis can realistically be guided by reference to both federal and state case law.

### 2. Application

There was sufficient evidence to sustain an award of compensatory damages for each of the successful plaintiffs; however, the awards were excessive.

Hill was hired by Airborne in July 1990. In 1995 or 1996, he was transferred to the Brooklyn Station, where he worked until the end of his employment with Airborne in October 1998. It was during this final two or three year period that Hill was the subject of Airborne's discrimination and retaliation.

Hill's diary recounted how the discrimination he suffered affected him emotionally. *See* Ex. AA. He states in the diary

that one day he left work sick, "feeling stressed by management." Ex. AA (Oct. 29, 1997). On another day, Hill recounts that he was "diagnosed with acute stress disorder." Ex. AA (Nov. 2, 1997). In addition, Hill testified that from October 1997 through April 1998, he took a disability leave and was seeing a psychologist for "stress" related to, *inter alia*, "the job." Tr. at 254–55. Hill also testified that after his final termination he was unable to obtain work for about a year and suffered significant economic hardships, including the loss of his car and house. *See* Tr. at 276. His termination also led to problems in his personal life; he grew apart from his family and started drinking more. *See* Tr. at 276.

Harrison began his employment at Airborne in April 1995; it ended when he lost his arbitration after being fully terminated in September 1996. *See* Tr. at 412–413. Despite his efforts to obtain comparable employment, Harrison was relegated, over Airborne's opposition, to obtaining unemployment benefits. Harrison testified that his "character was just destroyed" as a result of losing his employment and that his life has been "totally hard" since then. Tr. at 419–20. Specifically, Harrison stated that he separated from his wife, had two cars repossessed, was evicted from his apartment, and is living in a single room. *See* Tr. at 419.

Tyson started working for Airborne as a bike messenger in 1993 or 1994. *See* Tr. at 148–49. In March 1997, he was transferred to the Brooklyn Station and became a driver, where he worked until he lost his job in September 1998. *See* Tr. at 149–50. Tyson testified that he felt like "less of a man" at that time, and spoke in vague terms about the insult suffered to his character. Tr. at 162–63.

Alvarez testified that during the seven-month period between his full termination and his reinstatement he was unable to discharge his financial responsibilities to his wife and three young children. *See* Tr. at 90, 97–98, 116. This led to family problems; he "split up" with his wife and went to live with his mother. Tr. at 116. During that same period, Airborne challenged Alvarez's entitlement to unemployment benefits, albeit unsuccessfully. *See* Tr. at 118. In addition, Alvarez testified that he was "scared to go to work" because "[a]s a black man, you would go to work wondering when are you going to get fired." Tr. at 117.

Under the standard enunciated by the New York State Court of Appeals in *New York City Transit Authority,* plaintiffs' accounts of their emotional suffering, "corroborated by reference to the circumstances of [Airborne's] misconduct," entitled each of them to an award of compensatory damages. 78 N.Y.2d at 216, 573 N.Y.S.2d 49, 577 N.E.2d 40.

On the issue of excessiveness, the Court, for its comparative analysis, has looked to cases entailing a plaintiff's general testimony of humiliation and stress, without medical corroboration, resulting in family and/or personal problems, and has discerned that damages have generally been awarded in the range of $5,000 to $100,000. *See Wade v. Orange County Sheriff's Office,* 844 F.2d 951 (2d Cir.1988) (affirming compensatory damage award of $50,000 in employment discrimination for "unwarranted disciplinary actions" resulting in "humiliation" and "embarrassment"); *Perdue v. City Univ. of New York,* 13 F.Supp.2d 326 (E.D.N.Y.1998) (affirming award of $85,000 for intentional discrimination and for violation of the Equal Pay Act based on plaintiff's testimony that she felt "disgraced, embarrassed, scared" and experienced "significant stress"); *Trivedi v. Cooper,* 1996 WL 724743 (S.D.N.Y.Dec.17, 1996) (reducing compensatory damage award from $700,000 to

$50,000 in 42 U.S.C. § 1981 case for discrimination and retaliation because plaintiff's evidence, consisting of vague complaints of emotional distress, was not of sufficient "quality or quantity" to support the jury award); *McIntosh v. Irving Trust Co.*, 887 F.Supp. 662 (S.D.N.Y.1995) (reducing compensatory damage award in Title VII case, alleging discriminatory failure to promote and retaliation, from $219,000 to $20,000 because plaintiff's conclusory statements of emotional injury and resultant family problems constituted only "sparse evidence with respect to the magnitude or duration of any emotional injury"); *Dickerson v. HBO & Co.*, 1995 WL 767193 (D.D.C. Dec.21, 1995) (affirming compensatory damage award of $100,000 on Title VII retaliation claim based on plaintiff's testimony that he suffered "humiliation" and "emotional distress," and that his employment situation adversely affected his relationship with his wife and children); *Borja–Fierro v. Girozentrale Vienna Bank*, No. 91 Civ. 8743, 1994 WL 240360 (S.D.N.Y. May 27, 1994) (reducing damage award for mental anguish suffered in connection with a retaliatory discharge from $160,000 to $15,000); *Cosmos Forms, Ltd. v. State Div. of Human Rights*, 150 A.D.2d 442, 442, 541 N.Y.S.2d 50 (2d Dep't 1989) ($35,000 award reduced to $5,000 since the only evidence of mental anguish was the complainant's own testimony that she was " '[e]motionally and physically screwed up,' " and there was no evidence of the duration of her condition, its severity or consequences, or any medical treatment).

Based upon a comparison of the awards in these analogous cases, and weighing all of the credible evidence, as the Court is free to do in assessing whether a damage award is excessive, the Court concludes that each of the compensatory damage awards should be remitted as follows: [8]

a. **Hill**—The collective compensatory damage award for both the retaliation and discrimination claims should be reduced from $300,000 to $75,000.[9]

b. **Harrison**—The compensatory damage award should be reduced from $125,000 to $40,000

c. **Tyson**—The compensatory damage award should be reduced from $125,000 to $20,000

d. **Alvarez**—The compensatory damage award should be reduced from $150,000 to $50,000

## B. Punitive Damages

### 1. Legal Standards

 Punitive damages are not available under the New York State Human Rights Law, *see Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 101 (2d Cir.2001); however, they may be recovered under Title VII, Section 1981 and the New York City Human Rights Law. *See Cush–Crawford v. Adchem Corp.*, 271 F.3d 352, 356–57 (2d Cir.2001) (Title VII); *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 235 (2d Cir.2000) (New York City Human Rights Law); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 691

8. While the Court has applied the federal standard for excessiveness, the same outcome would here follow under the slightly less deferential state standard.

9. The Court will not attribute a specific dollar amount to each claim since Hill's testimony did not prescind between the suffering he experienced from the discrimination and retaliation. Notably, the jury was instructed that Hill cannot "recover twice for the same injury." Jury Charge at 9. Although being cautioned against double recovery, the jury was nonetheless given separate interrogatories for compensatory damages for Hill's discrimination and retaliation claims to make certain it did not award damages for a claim without finding liability on that claim.

(2d Cir.1998) (Section 1981). Under federal law, punitive damages are awarded when an "employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 529–30, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). A "positive element of conscious wrongdoing" is required. *Kolstad,* 527 U.S. at 538, 119 S.Ct. 2118 (quoting C. McCormick, Law of Damages 280 (1935)). "As an alternative to proving that the defendant knew it was acting in violation of federal law, '[e]gregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive.'" *Id.* "[T]he imposition of punitive damages under both federal and local law is governed by the federal standard." *Farias,* 259 F.3d at 102 (applying federal punitive damage standard to New York City Human Rights Law claims).

The jury was properly instructed in accordance with this standard, and Airborne does not challenge the Court's charge; rather, it contends that the evidence was insufficient to support any punitive damage award. Alternatively, it argues that the awards were excessive.

■ Regarding the magnitude of punitive damage awards, due process requires that they be " 'reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). In making this determination, the court is governed by the three guideposts erected by the Supreme Court in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996): "(1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive

damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Lee,* 101 F.3d at 809 (citing *Gore,* 517 U.S. 559, 116 S.Ct. 1589). In *Gore,* the Court noted that "reprehensibility" is "perhaps the most important" factor, and identified certain aggravating factors that are associated with "particularly reprehensible conduct," 517 U.S. at 575, 116 S.Ct. 1589: "(1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, and (3) whether a defendant has engaged in repeated instances of misconduct." *Lee,* 101 F.3d at 809 (citing *Gore,* 517 U.S. at 575–76, 116 S.Ct. 1589). As to the ratio of punitive to compensatory damages, there must be a reasonable relationship between them, but the Supreme Court has held that there is no "simple mathematical formula," *Gore,* 517 U.S. at 582, 116 S.Ct. 1589, and has suggested that the outer limit of an acceptable ratio of punitive to compensatory damages may be as high as ten to one. *See TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). The purpose of the third guidepost is to insure that defendants have " 'fair notice' that the wrongful conduct could entail a substantial punitive award." *Lee,* 101 F.3d at 811.

■ Even when the "punitive award is not beyond the outer constitutional limit marked out ... by the *Gore* guideposts," the court must separately inquire whether the award is "so high as to shock the judicial conscience and constitute a denial of justice." *Mathie v. Fries,* 121 F.3d 808, 816–17 (2d Cir.1997) (quoting *Zarcone v. Perry,* 572 F.2d 52, 56–57 (2d Cir.1978)); *see Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir.1996); *see also Farias,* 259

F.3d at 102 ("[T]he federal standard applies to claims for punitive damages under the [New York City Human Rights law]."). As with compensatory damages, the Court must make a "comparison with awards approved in similar cases." *Mathie,* 121 F.3d at 816–17. "In making that comparison, [the court must bear in mind] the purpose of punitive awards [-] to punish the wrongdoer and to deter others." *Id.* The wealth of the defendant may be a factor in determining the magnitude of an award that will adequately deter the defendant from future wrongdoing. *See Lee,* 101 F.3d at 813.[10] The practice of remittitur is applicable to punitive damage awards as well as compensatory damage awards; thus, a district court may condition a denial of a motion for a new trial on the plaintiff's accepting punitive damages in a reduced amount. *See Lee,* 101 F.3d at 808.

█ When faced with multiple punitive damage awards against a single defendant, the district court should make separate assessments of the amount of punitive damages that may be awarded to each plaintiff, being mindful, in applying the standards, which factors are of generalized and/or particularized application.

**2. Application**

█ There was sufficient evidence that Airborne displayed a "reckless indifference to the federally protected rights of an aggrieved individual" to permit an award of punitive damages for Hill, Harrison, Tyson and Alvarez. 42 U.S.C. § 1981a(b)(1). Arguably, it was reasonable for the jury to infer that Airborne's managers knew that their actions were in violation of federal law simply by virtue of the well-established Supreme Court case law on discrimination and retaliation, the long standing statutory schemes proscribing such conduct, the size of Airborne, and the common knowledge in today's society that employment discrimination is impermissible. *See DiMarco–Zappa v. Cabanillas,* 238 F.3d 25, 38 (1st Cir.2001) ("The extent of federal statutory and constitutional law preventing discrimination on the basis of ethnicity or race suggests that defendants had to know that such discrimination was illegal."); *Molnar v. Booth,* 229 F.3d 593, 604 (7th Cir.2000) (noting that punitive damages were appropriate because "[t]he events here took place in 1994, long after the law of sexual harassment had become well established by the Supreme Court"). In any event, Eller and Scarola admitted that they knew about Hill's 1996 EEOC complaint. *See* Tr. at 872, 980. The jury could reasonably infer from this fact that Airborne "knew it was acting in violation of federal law." *Farias,* 259 F.3d at 101.

On the issue of excessiveness, comparing punitive damage awards in other cases where employers were found liable for discrimination and/or retaliation, is of limited utility because a wide range of awards have been upheld. *See, e.g., Gonzalez v. Bratton,* 147 F.Supp.2d 180 (S.D.N.Y.2001) (court imposed punitive damage awards against three individual supervisors for $10,000, $25,000 and $75,000 for repeated instances of retaliatory discipline); *Oliver v. Cole Gift Centers, Inc.,* 85 F.Supp.2d 109 (D.Conn.2000) (court affirmed $200,000 punitive damage award against employer who fired employee because she was pregnant, causing her to lose her medical insurance); *Fernandez v. North Shore Orthopedic Surgery & Sports Medicine, P.C.,* 79 F.Supp.2d 197 (E.D.N.Y.2000) (court remitted a $100,000 punitive damage award against a medical center to $50,000, citing

**10.** During a separate phase of the trial, the parties presented evidence as to Airborne's

financial wherewithal.

lack of repeated instances of misconduct); *Greenbaum v. Handelsbanken,* 67 F.Supp.2d 228 (S.D.N.Y.1999) (court affirmed a $1.25 million punitive damage award against a bank that had subjected plaintiff to a pattern of discrimination and retaliation); *Ortiz–Del Valle v. National Basketball Ass'n,* 42 F.Supp.2d 334 (S.D.N.Y.1999) (court remitted a $7 million punitive damage award to $250,000 notwithstanding repeated instances of discrimination).

■■■ Applying the requisite standards, the Court is of the opinion that the punitive damage awards should be reduced. Notably, there were no acts or threats of violence, and Airborne's reprehensible conduct was primarily the product of Scarola's malicious behavior and the permissive environment he fostered for inappropriate behavior by his managerial underlings. While this cannot be condoned, and surely Airborne is responsible for the acts of its managers, the Court believes that a total punitive damage award of $1,000,000 is sufficient to punish Airborne for the racially discriminatory and retaliatory conduct of its managers at the Brooklyn Station during Scarola's reign, and to ensure appropriate future accountability. The Court will divide this sum amongst the successful plaintiffs by awarding them each $200,000 on their intentional discrimination claims. The Court finds that they generally shared similar abuses, and that there is no particular warrant under the facts of this case to make discrete particularized awards. Because Hill suffered separate, particular acts of retaliation, he should receive the remaining $200,000.

## CONCLUSION

Regarding McCord, Airborne's Rule 50(b) motion for judgment as a matter of law on liability is granted and his claim is dismissed. In respect to Hill, Harrison, Tyson and Alvarez, Airborne's Rule 50(b) and Rule 59 motions regarding liability are denied. In respect to compensatory damages, the Rule 50(b) motion is denied; the Rule 59 motion for a new trial is denied upon the condition that remittiturs reducing the awards are accepted, as follows: Hill—reduced to $75,000; Harrison—reduced to $40,000; Tyson—reduced to $20,000, Alvarez reduced to $50,000.[11] In respect to punitive damages, the Rule 50(b) motion is denied; the Rule 59 motion for a new trial is denied upon the condition that remittitur reducing each award to $200,000 is accepted. Each plaintiff shall notify the Court within twenty days from the date of filing of this Memorandum and Order of his remittitur decision. The Court will schedule a new trial on the issue of damages for any plaintiff that does not accept his remittitur.

11. · The Court notes that plaintiffs' damage awards are not subject to statutory caps. All of plaintiffs' claims, other than Hill's Title VII retaliation claim, were pled under statutes that have no caps on compensatory or punitive damages. *See* 42 U.S.C. § 1981a(b)(4) (Section 1981); *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 50 n. 1 (2d Cir.1998) (New York State Human Rights Law); *Katt v. New York,* 151 F.Supp.2d 313, 328 n. 10 (S.D.N.Y.2001) (New York City Human Rights Law); *Batavia v. New York State Div. Of Human Rights,* 35 N.Y.2d 143, 359 N.Y.S.2d 25, 316 N.E.2d 318 (1974) (New York State Human Rights Law); *Walsh v. Covenant House,* 244 A.D.2d 214, 664 N.Y.S.2d 282, 283 (1st Dep't 1997) (New York City Human Rights Law); *Hawkins v. 1115 Legal Service Care,* 163 F.3d 684, 691 (2d Cir.1998) (Section 1981); *Luciano v. Olsten Corp.,* 110 F.3d 210, 219–20 (2d Cir.1997) (Section 1981); *Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 235 (2d Cir.2000) (New York City Human Rights Law). That Hill's retaliation claim was also pled under Title VII, which does have a cap on compensatory and punitive damages, *see* 42 U.S.C. § 1981a(b)(4), is of no consequence because, as previously noted, he can recover these damages under either § 1981 or New York City Human Rights Law. *See Weissman v. Dawn Joy Fashions, Inc.,* 214 F.3d 224, 235 (2d Cir.2000).

There is one residual matter that needs to be addressed. The parties agreed that back pay would be for the Court to resolve. *See* Tr. at 675, 847. They are directed to confer with each other and attempt to reach agreement on the amounts of back pay, if any, and the date from which pre-judgment interest on any back pay award should run. If the parties are able to do so, they shall submit a stipulation to that effect within thirty days from the date of filing of this Memorandum and Order, and the Court will enter judgment accordingly. If the parties are unable to reach agreement on the back pay issue, they shall notify the Court within such thirty day period, and the Court will set the matter down for a hearing to determine plaintiffs' entitlement to back pay, if any, and the starting date for the calculation of pre-judgment interest. The monetary judgment to be entered shall include pre-judgment interest on the compensatory and punitive damage awards from the date of the verdict until judgment is entered based upon the United States fifty-two-week treasury bill rate referred to in 28 U.S.C. § 1961, with interest to be compounded annually. The same pre-judgment interest rate will apply to any back-pay award. *See Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 56 (2d Cir.1998) ("[I]t is within the trial court's broad discretion to elect whether and how to compute pre-judgment interest."); *see also Colwell v. Suffolk County Police Dept.,* 967 F.Supp. 1419, 1436 (E.D.N.Y.1997), *rev'd on other grounds,* 158 F.3d 635 (2d Cir. 1998) (applying United States fifty-two-week treasury bill rate in discrimination case for pre-judgment interest rate).

**SO ORDERED.**